**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RICHARD MURRAY, III,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 07-0771-WS-M** |
| | ) | |
| **HOLIDAY ISLE, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the undersigned on defendant's Motion for Summary Judgment (doc. 58) and plaintiffs' Motion for Partial Summary Judgment (doc. 67). These cross-motions have been the subject of extensive briefing, and are now ripe for disposition.[1] Also pending is defendant's Motion for Leave to Submit Supplemental Evidence (doc. 57). That Motion is **granted**, and the Affidavit of Paul C. Wesch appended to defendant's Notice of Supplemental Filing (doc. 69) is **accepted** and will be considered by the Court in adjudicating the cross-motions for summary judgment.[2]

---

[1]    In reviewing the parties' filings, the Court notes several respects in which they deviate from applicable rules. For example, plaintiffs skirt the page limitations of Local Rule 7.1(b) by violating the spacing (eschewing double-spacing in favor of 1.5-spacing) and typeface (tiny footnote fonts) requirements of Local Rule 5.1(a). For its part, defendant filed a Reply Brief (doc. 99) that exceeds the page limitations imposed by LR 7.1(b) without court authorization. Additionally, while plaintiffs submitted Proposed Findings of Fact and Conclusions of Law (doc. 65-25), that submission falls well short of the prescriptions of Local Rule 7.2(a). Notwithstanding these discrepancies, in the interests of efficiency and judicial economy, the Court accepts and will consider all of the parties' summary judgment submissions, with the caveat that counsel must ensure that future filings comport with the Local Rules.

[2]    During the pendency of summary judgment briefing, this action was stayed for approximately three months pursuant to 11 U.S.C. § 362 because of Holiday Isle's filing of a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of Alabama. (Doc. 91.) The Court lifted the stay via Order (doc. 96) dated January 23, 2009 upon being informed that the Bankruptcy Court had granted plaintiffs relief from the automatic stay. To allay any lingering doubts, the Court hereby **withdraws** the reference of this matter to the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).

**I.     General Background.**

Defendant, Holiday Isle, LLC ("Holiday Isle"), is the developer of a condominium project entitled Holiday Isle, a Condominium (the "Project"), located in Dauphin Island, Alabama.  The Offering Statement for the Project reflects that it was to consist of 144 residential units located in a seven-story building, plus numerous amenities such as a three-level parking garage, outdoor and indoor swimming pools and decks, tennis courts, hot tub, sauna, exercise room, community room, and other facilities.  (Wesch Aff., at Exh. F.)  Construction was contemplated to begin in May 2005 and to conclude by April 2007.  (*Id.*)

This dispute relates to five specific condominium units at the Project.  The seven plaintiffs (who are all related to each other by blood or marriage) entered into preconstruction purchase agreements with Holiday Isle to purchase such units in early 2005.  Despite being repeatedly asked to do so by the developer, none of the plaintiffs ever closed on those units, as a result of which Holiday Isle ultimately drew on letters of credit provided by plaintiffs to take possession of plaintiffs' security deposits.  Plaintiffs now want their deposits back, but defendant has refused to reimburse them.

On October 30, 2007, plaintiffs[3] filed a Complaint for Declaratory Judgment and Damages (doc. 1) against Holiday Isle in this District Court.  The Complaint identifies the following four causes of action: (a) as Count One, a claim under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701 *et seq.* ("ILSFDA"), for rescission of the purchase agreements and damages based on, *inter alia*, Holiday Isle's failure to include mandatory statutory language in the agreements concerning plaintiffs' rescission rights;[4] (b) as Count Two,

---

[3]     The seven plaintiffs are Richard Murray, III, Celeste F. Taylor (misidentified in the pleadings as "Celestine F. Taylor"), Jay Murray, Lisa Murray, Arthur Fitzner, John Gardner, and Tracey Gardner.  These individuals will be referred to collectively herein as "plaintiffs." Because they are similarly situated in many (but not all) material respects, plaintiffs will be singled out by name only where individual-specific facts or issues arise.

[4]     In an Order (doc. 18) entered on May 30, 2008, this Court dismissed as untimely plaintiffs' rescission claims in Count One, but preserved the damages aspect of that ILSFDA cause of action for further litigation.  *See Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1276 n.13 (S.D. Ala. 2008) ("The non-rescission aspects of Count One are not dismissed by this Order, and plaintiffs may continue to pursue Count One to the extent it calls for remedies other

a claim seeking a declaration that, *inter alia*, Holiday Isle is obligated to refund plaintiffs' security deposits pursuant to Paragraph 6(B) of the agreements, which required the units to be completed within two years, and Paragraph 11, which identified certain prerequisites to defendant's ability to draw on the letters of credit; (c) as Count Three, a claim for conversion based on Holiday Isle's allegedly unlawful drawing on plaintiffs' letters of credit to possess and control their security deposits; and (d) as Count Four, a claim for declaratory judgment solely on behalf of plaintiff Fitzner that he validly rescinded his offer to purchase a unit at Holiday Isle on June 5, 2007, rendering his purchase agreement of no legal force or effect and necessitating the return of his deposit.

Though one would never guess it from the parties' sprawling summary judgment submissions,[5] the issues on which the outcome of this action hinges are quite discrete. The critical questions are, for purposes of Count One, whether plaintiffs were damaged by Holiday Isle's omission of mandatory statutory language regarding plaintiffs' rescission rights and, for purposes of Count Two, what meaning is ascribed to the contractual terms "Unit" and "completed," and whether plaintiffs were actually in default. It is on those questions that this Order will focus. Count Three appears closely linked to Count Two, and Count Four may be quickly disposed of on independent grounds.

## II.     Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be

---

than rescission."). In the wake of that ruling, at least two other district courts have examined and agreed with *Taylor* in construing and applying § 1703(c) and § 1711(b) as they relate to the timeliness of ILSFDA rescission claims. *See Meitis v. Park Square Enterprises, Inc.*, 2008 WL 5351619, *3 n.2 (M.D. Fla. Dec. 17, 2008); *Ditthardt v. North Ocean Condos, L.P.*, 580 F. Supp.2d 1288, 1292 (S.D. Fla. 2008).

[5]     Indeed, the parties' cross-motions encompass approximately 120 pages of briefing and nearly 1,000 pages of exhibits. Many of these filings criss-cross the same factual and legal terrain in an overlapping manner, leaving the Court to sift through the repetitious and the tangential in an effort to ferret out the distinct and the substantial.

decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11ᵗʰ Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11ᵗʰ Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11ᵗʰ Cir. 1987) (citation omitted).

      "The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007); *see also May v. A Parcel of Land*, 458 F. Supp.2d 1324, 1333 (S.D. Ala. 2006) (same).  Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11ᵗʰ Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8ᵗʰ Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts."  *Godard*, 485 F. Supp.2d at 1291; *see also May*, 458 F. Supp.2d at 1333.⁶

---

      ⁶       The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11ᵗʰ Cir. 2007).  Thus, with respect to each motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable

III.    **ILSFDA Cause of Action (Count One).**

    A.    *Plaintiffs' Motion for Summary Judgment as to Liability.*

"The ILSFDA was intended to curb abuses accompanying interstate land sales." *Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444, 1448 (11th Cir. 1985).[7] Indeed, "[t]he underlying purpose of the [ILSFDA] is to insure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts which will enable him to make an informed decision about purchasing the property." *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98, 99 (5th Cir. 1978); *see also Winter*, 777 F.2d at 1449 (statute requires that buyer receive information necessary to make his decision prior to entering into purchase agreement); *United States v. Steed*, 674 F.2d 284, 287 (4th Cir. 1982) (ILSFDA "is a comprehensive statute requiring subdivision developers, unless exempt, to furnish prospective purchasers pertinent information about lots offered for sale").  In light of its remedial objectives, the ILSFDA "must be applied liberally in favor of broad coverage," with exemptions being construed "narrowly, in order to further the statute's purpose of consumer protection."  *Pigott v. Sanibel Development, LLC*, 576 F. Supp.2d 1258, 1267 (S.D. Ala. 2008) (citations omitted); *see also Schatz v. Jockey Club Phase III, Ltd.*, 604 F. Supp. 537, 541 (S.D. Fla. 1985) (explaining that ILSFDA "should be construed not technically, but flexibly to effectuate its remedial purposes").

Plaintiffs have unquestionably made a *prima facie* showing that their transactions with Holiday Isle fall within the ambit of the ILSFDA.  The Holiday Isle condominium development was marketed as a 7-story building consisting of 144 residential units.  (Doc. 65, Plaintiffs' Exh. 1, at ¶ 3.)  Those units were, by all appearances, subject to a "common promotional plan" within

---

inferences are drawn in his, her or its favor.

    [7]    *See also Stein v. Paradigm Mirsol, LLC*, 551 F. Supp.2d 1323, 1327 (M.D. Fla. 2008) ("The ILSFDA is an anti-fraud statute that uses disclosure as its primary tool to protect purchasers from unscrupulous sales of undeveloped home sites."); *Pugliese v. Pukka Development, Inc.*, 524 F. Supp.2d 1370, 1371 (S.D. Fla. 2007) (explaining that the Act was "designed to discourage fraud by keeping buyers informed through rigorous disclosure requirements"), *reversed on other grounds*, 550 F.3d 1299 (11th Cir. 2008); *Aboujaoude v Poinciana Development Co. II*, 509 F. Supp.2d 1266, 1269 (S.D. Fla. 2007) (legislative intent in enacting ILSFDA was to protect purchasers from unscrupulous out-of-state sellers of land purportedly suitable for development but actually underwater or only fit for grazing).

the meaning of the ILSFDA.  *See* 15 U.S.C. § 1701(4) (defining "common promotional plan" as "a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease").  Moreover, such units were marketed and sold in interstate commerce, including marketing efforts by a Florida real estate broker.  (Doc. 65, Plaintiffs' Exh. 2, at HI-000268; Wesch Dep., at 106.)  One or more purchasers (albeit not the plaintiffs in this case) signed their purchase agreements at the broker's offices in Destin, Florida.  (Doc. 73, Exh. B, at 22-23.)  Against this showing that the Project lies within the scope of the ILSFDA, Holiday Isle has identified no countervailing facts, has invoked no specific exemptions, and has advanced no arguments that the Project is for any reason exempt from the disclosure requirements of the ILSFDA.[8]

_____

[8]     To be sure, Holiday Isle has dropped multiple footnotes in its summary judgment briefs wherein it purports to "reserve its rights" to litigate the applicability of ILSFDA exemptions at some other time in some other forum.  *See* Defendant's Reply (doc. 99), at 7 n.11 ("Defendant Holiday Isle reserves all rights to address on any appeal above the exemptions affirmatively pleaded in response to the Plaintiffs' Complaint."); Defendant's Opposition (doc. 76), at 10 n.9 ("Defendant Holiday Isle reserves all rights to address the exemptions affirmatively pleaded in response to the Plaintiffs' Complaint," but "will not address those here" in light of this Court's rulings in certain other ILSFDA cases).  The efficacy of defendant's purported "reservation of rights" for appeal need not be adjudicated at this time, but is questionable, at best.  *See generally Johnson v. Board of Regents of University of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001) (nonmovants "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions").  It is pellucidly clear that (a) plaintiffs have moved for summary judgment on the liability aspects of their ILSFDA claim, (b) plaintiffs' Rule 56 filings embrace an argument that the Project is covered by the ILSFDA, and (c) in its voluminous summary judgment filings, Holiday Isle has advanced no facts, argument or authority of any kind that might support a determination that the Project is exempt from the disclosure requirements of the ILSFDA.  If Holiday Isle has a viable basis in law or fact for claiming an ILSFDA exemption, now is the time to raise it.  Defendant having elected not to do so, this Court will not endeavor to formulate arguments for it, nor will the Court unilaterally address each of Holiday Isle's potential affirmative defenses in the absence of any effort by defendant to litigate them on summary judgment.  Besides, review of Holiday Isle's Answer (doc. 6) reveals nothing in the "Affirmative Defenses" section that reasonably invokes any specific exemption to the ILSFDA.  The only "Affirmative Defenses" pleaded in the Answer are a generic defense that the Complaint fails to state a claim on which relief can be granted, a generic limitations defense, a blanket denial of all allegations not made in numbered paragraphs, and a purported reservation of rights to supplement its Answer.  (Doc. 6, at 7.)

Having found (based on the parties' summary judgment submissions) that the Project was covered by the ILSFDA, the Court now turns to the specific aspects of that statute germane to these proceedings.  One of the ILSFDA's requirements is that a developer selling a nonexempt lot must furnish the purchaser with a document called a "property report" in advance of the execution of a purchase agreement.  *See* 15 U.S.C. § 1703(a)(1)(B) (declaring it unlawful for a developer to use means of communication in interstate commerce "to sell or lease any lot unless a printed property report ... has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee"); 24 C.F.R. § 1710.3 ("In non-exempt transactions, the developer must give each purchaser a printed Property Report ... in advance of the purchaser's signing of any contract or agreement for sale or lease.").[9]  "The fundamental purpose of the property report requirement is to provide information designed to assist potential buyers in making a fully-informed decision whether to purchase."  *Pigott*, 576 F. Supp.2d at 1267 (citation and internal quotation marks omitted).  It is undisputed that Holiday Isle did not furnish any of the plaintiffs in this case with the requisite property report prior to their execution of their purchase agreements.[10]

By its terms, the ILSFDA provides that if a developer fails to furnish the requisite property report to the purchaser in advance of the latter's execution of the purchase agreement, "such contract or agreement may be revoked at the option of the purchaser ... within two years from the date of such signing, and ***such contract or agreement shall clearly provide this right***."  15 U.S.C. § 1703(c) (emphasis added).  It is undisputed that none of the purchase agreements drafted by Holiday Isle, presented to plaintiffs, and executed by the parties included the notice required by § 1703(c) pertaining to purchasers' right of revocation for want of a property

---

[9]      "Although the statutory language is phrased in terms of 'lots,' it is well-established that the Act's requirements encompass condominium sales such as those herein."  *Pigott*, 576 F. Supp.2d at 1267 n.18 (citations omitted).

[10]      Indeed, Holiday Isle expressly conceded in discovery "that it did not provide Plaintiffs with a Property Report before Plaintiffs signed their Preconstruction Purchase and Escrow Agreements."  (Doc. 65, Plaintiffs' Exh. 3, at # 16.)

report.[11]

Plaintiffs' revocation theory having previously been dismissed as time-barred by this Court, *see Taylor v. Holiday Isle, LLC*, 561 F. Supp.2d 1269, 1276 (S.D. Ala. 2008), all that remains of Count One are plaintiffs' claims for damages. As set forth *supra*, the summary judgment record reflects that the Project is subject to ILSFDA's disclosure requirements, and Holiday Isle has offered neither evidence nor argument to the contrary. Moreover, Holiday Isle has conclusively admitted that it did not comply with § 1703(c)'s requirement that the purchase agreements spell out plaintiffs' right to revoke the deal at their option within two years if (as happened here) no property report was furnished to them prior to execution.[12] Stringing these

---

[11]     Holiday Isle has admitted in discovery "that the Preconstruction Purchase and Escrow Agreement for Holiday Isle, a condominium[,] did not contain the statement that the Purchasers had the right to rescind the contract within two years from the date of signing." (Doc. 65, Plaintiffs' Exh. 3, at #17.) Review of the agreements signed by each plaintiff in this case confirms the veracity of this admission. (Doc. 1, at Exh. A.)

[12]     Remarkably, Holiday Isle attempts to avoid § 1703(c)'s disclosure requirements by asserting that "[t]hese disclosures are optional." (Doc. 76, at 10.) This contention is wholly lacking in legal foundation. Nothing in the statutory language can reasonably be read as conferring upon a developer an option in its discretion to recite the plaintiffs' revocation rights or not in the contract, as it sees fit. To the contrary, statutory language that the "agreement *shall* clearly provide this right," 15 U.S.C. § 1703(c) (emphasis added), is both mandatory and unambiguous. Nor is Holiday Isle's position bolstered by its citation to *Pugliese v. Pukka Development, Inc.*, 524 F. Supp.2d 1370 (S.D. Fla. 2007). The district court in *Pugliese* opined that the inclusion of § 1703(d) information concerning property description, means for curing buyer default, and procedures for handling seller default "is not mandatory." *Id.* at 1372. Thus, *Pugliese* dealt with a different statutory provision containing different language and addressing different disclosures from those at issue here. Nothing in *Pugliese* would reasonably support a conclusion that the § 1703(c)-mandated disclosure of a purchaser's revocation rights is an optional matter committed to the developer's unfettered discretion.

Equally unavailing are Holiday Isle's protestations, supported by no citations to authority or evidence, that this Court should unilaterally suspend the ILSFDA here because its protections were "never envisioned" to reach a situation where there is no fraud and plaintiffs did "[n]ot car[e] of the right to rescind under ILSA" given their failure to invoke it until after the two years had expired. (Doc. 76, at 10.) As to the first point, the Court is aware of no authority (and Holiday Isle presents none) suggesting that ILSFDA's mandatory disclosure prescriptions in § 1703(c) may be disregarded if plaintiffs were not actually defrauded. Defendant's insinuation that ILSFDA disclosure violations may be forgiven if the purchaser is sufficiently sophisticated finds no textual support in the statute. As to the second point, Holiday Isle's suggestion that

points together, the Court finds as a matter of law that Holiday Isle violated 15 U.S.C. § 1703(c) by omitting from the purchase agreements language apprising plaintiffs of their right to rescind for want of a property report.  As such, plaintiffs' Motion for Partial Summary Judgment is **granted** as to Count One, and Holiday Isle is **liable** to plaintiffs for any damages they incurred that were proximately caused by that § 1703(c) violation.[13]

### B.    *Defendant's Motion for Summary Judgment as to Damages.*

Notwithstanding the Court's granting of plaintiffs' Motion for Partial Summary Judgment as to Count One, Holiday Isle maintains in its cross-motion that Count One should be dismissed because plaintiffs cannot prove that they were damaged in any way by Holiday Isle's omission from the agreements of notice concerning their rescission rights.  Defendant points to no deposition testimony or other evidence tending to show that plaintiffs have not sustained damages as a result of the § 1703(c) violation, but instead simply makes a general, conclusory statement that no such damages exist.[14]

---

plaintiffs did not care about their right to rescind until two years had passed must be counterbalanced with plaintiffs' evidence that they were unaware of that right until two years had passed.  Of course, they might have known about that right if Holiday Isle had complied with § 1703(c)'s unambiguous disclosure requirements; therefore, the blame for plaintiffs' inaction within the two-year period may rest squarely on Holiday Isle.

Finally, the Court duly notes defendant's objection that "[p]laintiffs have certainly not shown reason to give summary judgment for their punitive damages claim."  (Doc. 76, at 10.)  Scrutiny of the Complaint does not reveal any claim for punitive damages in Count One; rather, plaintiffs' punitive damages request is confined to Count Three.  Defendant's punitive damages argument as to Count One appears misplaced.

[13]    To be clear, Holiday Isle's violation of § 1703(c) is actionable under 15 U.S.C. § 1709(b), which provides that a purchaser "may bring an action at law or in equity against the seller ... to enforce any right under subsection (b), (c), (d), or (e) of section 1703 of this title."  § 1709(b).  The remedies available to purchasers in such a suit include damages, taking into account the amount the purchasers actually paid, and may also include interest, court costs, reasonable attorneys' fees and the like.  *See* 15 U.S.C. § 1709 (a), (c).

[14]    When plaintiffs point out Holiday Isle's failure to show that plaintiffs were not damaged, defendant's immediate rejoinder is that "[i]t is not Holiday Isle's burden to prove this negative."  (Defendant's Reply (doc. 99), at 6.)  This comment clashes with binding appellate authority.  *See, e.g., Imaging Business Machines, LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1190 (11th Cir. 2006) ("In the context of a motion for summary judgment arguing a lack of injury, the defendant's initial burden is to show that a plaintiff lacks evidence regarding each injury alleged

In opposing defendant's Motion, plaintiffs maintain that the summary judgment record is replete with evidence that if Holiday Isle had included the § 1703(c) language concerning their rescission rights, they would have rescinded within the two-year period, and would never have lost their security deposits.  For example, plaintiff Jay Murray avers that he reread the purchase agreement in late 2006 or early 2007 to determine his and Holiday Isle's respective rights and obligations when he became concerned that the unit would not be completed by April 1, 2007. (J. Murray Aff. (doc. 65-11), at ¶ 7.)  According to Jay Murray, "Had the contract contained a provision stating that I could have rescinded the contract with[in] two years of my execution of it, I would have checked the date of execution and, given that the units and development did not appear to be in a position for use or rental, I would have rescinded the Contract."  (*Id.*, ¶ 8.) Plaintiff John Gardner makes a similar averment.  (J. Gardner Aff. (doc. 65-16), ¶ 6.)  Plaintiff Celeste Taylor testified in her deposition that had her purchase agreement specified that she had the right to rescind it, she would have investigated that right.  (Taylor Dep., at 61.)  Likewise, plaintiff Arthur Fitzner testified that, in hindsight, he wished that he had been told of his right to rescind in two years, raising an inference that he would have exercised that right had Holiday Isle imparted such knowledge.  (Fitzner Dep., at 64.)  Plaintiff Tracey Gardner said the same thing.  (Gardner Dep., at 72.)

Plaintiffs' point is that they were damaged by Holiday Isle's breach of the § 1703(c) disclosure requirement because they were kept in the dark concerning their rescission rights until it was too late to exercise them.  On that basis, plaintiffs contend that their damages proximately caused by Holiday Isle's § 1703(c) violation are the loss of their security deposits and interest on same that they would have received had Holiday Isle apprised them of their rescission rights in

---

to be proximately caused by its wrong."); *see generally Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (opining that summary judgment movant always shoulders "initial burden of production in demonstrating the absence of any genuine issue of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged"); *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) ("the moving party may discharge this initial responsibility by showing that there is an absence of evidence to support the nonmoving party's case").  Holiday Isle had ample opportunity in the discovery process to develop evidence concerning plaintiffs' damages or lack thereof, and should have presented such evidence with its Rule 56 motion to the extent that the evidence supported its position that plaintiffs were not injured by the ILSFDA disclosure violation.

the agreements, inasmuch as they would have exercised those rights in a timely fashion had they known about them.

Confronted with plaintiffs' evidence of damages, Holiday Isle offers a perplexing argument that "[i]f Plaintiffs had any damages, their opportunity for any attempt to show them has long expired."  (Defendant's Reply (doc. 99), at 6.)  The Federal Rules of Civil Procedure provide otherwise.  Plaintiffs' opportunity to come forward with a showing of damages is right now, in response to Holiday Isle's Rule 56 motion predicated on lack of damages.  *See generally Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) ("To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion.").  This, of course, is exactly what plaintiffs have done.  In the absence of evidence or persuasive argument that plaintiffs' summary judgment evidence improperly contradicts their discovery responses or was withheld during discovery, defendant's suggestion that the summary judgment stage is too late in the game for plaintiffs to show injury has no discernable basis.

Next, Holiday Isle attempts to impugn plaintiffs' damages evidence by asserting that plaintiffs' "filing a motion for 'partial' summary judgment on liability only is a transparent admission they cannot prove damages, an essential element to these ILSA claims."  (Doc. 99, at 6.)  It is nothing of the sort.  Plaintiffs moved for summary judgment as to liability only on Count One because they properly recognized that whether and how much they have been damaged are questions of disputed fact that are not amenable to disposition via the Rule 56 vehicle.  It is neither unusual nor inappropriate for plaintiffs in federal court to seek summary judgment as to liability only, leaving their damages to be proven at trial, and no adverse inference is warranted from these plaintiffs' decision to frame their motion for summary judgment in that fashion.

Defendant also seeks to discredit plaintiffs' damages showing via misreading of the statute.  According to Holiday Isle, "[s]ince the essence of ILSA's Section 1703(c) is the Property Report, Plaintiffs must show damages caused by not receiving a Property Report before they signed their agreements."  (Doc. 99, at 7.)  Defendant furnishes neither authority nor explanation for this conclusory interpretation.  More to the point, this construction of § 1703(c) appears wholly divorced from the statutory language.  As the Court reads it, § 1703(c) consists of two distinct parts, a rescission element and a notice element.  First, that section creates a two-

-11-

year option for a purchaser to rescind a purchase agreement for a lot as to which the developer failed to provide a required property report.  Nothing in the statutory language purports to confine or limit this rescission option to only those cases in which the purchaser has incurred actual damages by dint of the seller's failure to furnish a property report; to the contrary, that option is couched as an absolute, unfettered right on the part of the purchaser.  Second, § 1703(c) requires the purchase agreement clearly to delineate the buyer's rescission rights.  The statutory language does not circumscribe this disclosure obligation to cases in which the purchaser was harmed by the seller's failure to provide a property report.  Rather, the crux of the provision is the seller's obligation in all non-exempt transactions to notify a purchaser in writing of his or her right to rescind.  Where a purchaser has been damaged by nondisclosure of these rescission rights as required by § 1703(c), the purchaser plainly has an actionable ILSFDA claim pursuant to § 1709(b).  It is under this second aspect of § 1703(c) that Count One is proceeding.

Simply stated, the text of § 1703(c) does not support Holiday Isle's contention that plaintiffs' damages must necessarily be tied to their lack of receipt of a property report.  Section 1703(c) unambiguously requires a seller to provide notice to a purchaser of his or her right to rescind the agreement within two years if no property report has been provided.  If, as plaintiffs have shown, no notice was provided and they were harmed as a result of that lack of notice of their rescission rights, then they may have a cognizable claim for damages.  Whether or not plaintiffs were damaged by the developer's failure to furnish them a property report is irrelevant because their rescission rights exist independently of any damages flowing from the lack of a property report.  In other words, plaintiffs' rescission rights were absolute where no property report was given, and if plaintiffs can establish that (a) defendant did not tell them of their right to rescind, (b) they did not know of their right to rescind until after the two-year rescission period had expired, (c) they would have timely exercised their rescission option had Holiday Isle informed them of same as the ILSFDA required it to do, and (d) they have incurred damages as a result of their inability timely to exercise their rescission option, then they are entitled to recover those damages under § 1709(b) of the ILSFDA.[15]

---

[15]      Nor is it of any consequence that plaintiffs have identified no other damages than their lost security deposits, along with associated interest and attorney's fees.  Holiday Isle cites

As its next basis for overriding plaintiffs' damages showing, Holiday Isle points to record evidence that several plaintiffs are savvy real estate market players and that "no Plaintiff has any practical or equitable cause for complaints." (Doc. 99, at 8.)  Certainly, the record supports defendant's stance that Richard Murray has bought and sold raw land on multiple occasions (R. Murray Dep., at 27), that Celeste Taylor previously worked for Holiday Isle's manager as a marketing director (Taylor Dep., at 9), that Arthur Fitzner is in the business of owning and managing real estate (Fitzner Dep., at 11), and that Jay Murray previously contracted to buy a condominium unit elsewhere and "flipped" it for a profit (J. Murray Dep., at 20).  This aspect of defendant's showing is unavailing on summary judgment for two reasons.  First, the legal standard for recovery of damages under the ILSFDA is not whether a plaintiff has "practical or equitable cause for complaints."  If Holiday Isle violated its disclosure obligations under § 1703(c), and if such violation proximately caused damages to plaintiffs, then plaintiffs are entitled to recover those damages in this action, notwithstanding any "practicalities" or "equities."  Second, that plaintiffs may have some measure of sophistication creates, at most, questions of fact as to whether they did or did not know about their rescission rights under the ILSFDA.  Defendant has pointed to neither deposition testimony nor other evidence establishing that plaintiffs were aware of their right to rescind, independently of Holiday Isle's disclosure obligations, prior to expiration of their time frame for doing so.  That plaintiffs may have had some familiarity with other aspects of real estate sales and management is not tantamount to an admission that they were aware of their rescission rights, so as to negate their damages caused by defendant's failure to notify them of same.

---

excerpts from various plaintiffs' depositions to show that they have disclaimed all other forms of damages. *See* R. Murray Dep., at 43-44 (answering in the negative when asked if Holiday Isle has caused him any damages other than his forfeited deposit); Taylor Dep., at 39 (denying that she is alleging damages other than loss of earnest money plus interest and associated attorney's fees); Fitzner Dep., at 57 (indicating that the deposit, interest, and attorney's fees were "pretty much it" for his financial losses); Gardner Dep., at 144-45 (testifying that their only alleged damages were those associated with loss of earnest money deposit, plus "[p]ain and suffering sitting through this deposition"); J. Murray Dep., at 70-74 (listing his damages as disbursement of funds from letter of credit, interest charges, attorney's fees, and loss of time).  This testimony may limit the scope of plaintiffs' recoverable damages at trial, but it does not lend credence to Holiday Isle's position that plaintiffs have incurred no damages at all.

-13-

In a more direct challenge, defendant attacks plaintiffs' testimony that they would have rescinded in a timely manner had they known they had a right to do so as "self-serving astigmatic hindsight," "illogical (circular) reasoning," and an "unreasoned suggestion" for claiming "illogical damages."  (Doc. 99, at 7-8.)  Such derisive name-calling cannot avail Holiday Isle.  To the extent that defendant is exhorting this Court not to believe plaintiffs' statements, that sort of credibility assessment is ill-suited for the Rule 56 context.  *See, e.g., Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1266 n.1 (11th Cir. 2006) ("Credibility determinations at the summary judgment stage are impermissible.").  Moreover, notwithstanding defendant's efforts to brand it so, the Court perceives nothing about plaintiffs' theory of damages that is "illogical."  Plaintiffs failed to exercise their statutory option to rescind their purchase agreements within two years for want of a property report.  As a result, they lost their right to recover their security deposits and walk away from contracts on which (for whatever reason) plaintiffs no longer wished to close.  The question is why they did not rescind in time.  If plaintiffs prove at trial (as they have averred in declarations and deposition testimony) that the reason why they did not rescind in a timely manner was that Holiday Isle failed to disclose their right to rescind in the purchase agreements, as Holiday Isle was obligated to do under § 1703(c), then plaintiffs will be entitled to recover those lost security deposits, and potentially interest and attorney's fees, as damages.  To hold otherwise would be effectively to excise the § 1703(c) notice of rescission rights requirement from the text of the statute.  In short, plaintiffs' theory of recovery is legally sound, and will not be disallowed on summary judgment just because Holiday Isle disparages it.[16]

_____

[16]     Nor is the Court persuaded by Holiday Isle's attempt to argue that plaintiffs' position contradicts their deposition testimony that they did not discuss or consider getting out of their Agreements until the time frame of April - June 2007, which is after the two-year ILSFDA rescission period expired.  Even accepting defendant's characterization of the relevant deposition passages, there is no inconsistency.  Plaintiffs' evidence, if believed, establishes that they would have considered rescission at a much earlier date, prior to the ILSFDA rescission deadline, had they been aware of their right to do so.  In other words, plaintiffs' theory is that had Holiday Isle disclosed their right to rescind, as it was statutorily obligated to do, the rescission issue would have been on plaintiffs' radar screens well before expiration of that two-year statutory period.  This theory is fully reconcilable with plaintiffs' deposition testimony that, without knowledge of the ILSFDA rescission deadline, they did not contemplate getting out of their Agreements until

Lastly, defendant maintains that plaintiffs' evidentiary showing is inadequate to establish that they were, in fact, damaged in this respect. Holiday Isle points to a paucity of evidence that plaintiffs other than Jay Murray read their agreements or that plaintiffs wanted to rescind their agreements prior to the expiration of the two-year period. Holiday Isle also identifies record evidence that the Gardners do not recall any provisions of their purchase agreement, and suggests that if the other plaintiffs were relying on Jay Murray to read and interpret their contracts for them, it was unreasonable of them to do so because he was not a party to any agreement other than his own and that of his wife, plaintiff Lisa Murray. While these facts (if accurate) may muddy the waters and create genuine issues of material fact as to whether plaintiffs' failure to rescind their agreements in a timely manner was actually caused by Holiday Isle's violation of § 1703(c), they do not conclusively disprove plaintiffs' damages so as to entitle Holiday Isle to judgment as a matter of law on Count One.[17]

_____

after the § 1703(c) two-year period (of whose existence they were unaware thanks to Holiday Isle's failure to furnish mandatory disclosures) had already passed.

[17]     Some elaboration may be beneficial here. Defendant identifies no evidence showing that any plaintiff failed to read his or her purchase agreement; thus, from movant's standpoint, the record is, at best, undeveloped on this point. Even if other plaintiffs did not read their agreements (which cannot be determined at this juncture based on the lack of evidence adduced by defendant), that omission would not necessarily negate causation because plaintiff Jay Murray has averred that he re-read the agreement in late 2006 and early 2007, and that he consulted with other plaintiffs about its terms. (J. Murray Aff., ¶¶ 7, 9.) If plaintiffs' evidence is true that Jay Murray was reviewing the contract and disseminating information concerning their provisions to other plaintiffs, and if plaintiffs prove at trial that the other six plaintiffs actually relied on accurate information from Jay Murray about the contracts' contents (which were substantially the same from one plaintiff to the next), then Holiday Isle's § 1703(c) nondisclosure violation could still have caused those other plaintiffs not to rescind their agreements. With respect to the Gardners, their deposition testimony was not that they "do not recall any of the provisions of the Agreement," as defendant characterized it. (Doc. 99, at 8.) To the contrary, the Gardners did remember that the contract could be terminated if construction was not completed by a certain date. (Gardner Dep., at 169.) Moreover, the Gardners specifically testified that they read and re-read their Agreement at some point after signing it. (*Id.* at 114-15.) The Court cannot assume for summary judgment purposes, as defendant would have it do, that the Gardners would not have remembered the § 1703(c) rescission option had Holiday Isle satisfied its statutory duty of reciting it in the agreement. These questions of whether plaintiffs would have noticed if Holiday Isle had satisfied § 1703(c) and whether they would have rescinded in a timely manner had they known are valid and indeterminate on this

In light of the foregoing, defendant's Motion for Summary Judgment is **denied** as to plaintiffs' damages claim for the § 1703(c) violation alleged in Count One.  The Court finds that triable issues remain as to (a) whether Holiday Isle's violation of its ILSFDA disclosure obligations under § 1703(c) proximately caused plaintiffs not to exercise their right of rescission in a timely manner, and (b) if so, the amount of each plaintiff's damages.  Those aspects of Count One will proceed to trial.[18]

## IV.    Declaratory Judgment Cause of Action (Count Two).

Count Two of the Complaint is a state-law claim requesting a declaration of the parties' respective rights and obligations under the purchase agreements entered into between plaintiffs and Holiday Isle.  According to the Complaint, Holiday Isle was obligated by paragraph 6(B) of those agreements to refund plaintiffs' security deposits because the units were not completed within the timeframe specified by contract.  The Complaint further alleges that Holiday Isle breached those agreements by (i) not providing units that were suitable for occupancy within a two-year period, (ii) not allowing unit owners ingress to and egress from their units, (iii) not completing common areas, (iv) not allowing unit owners to occupy their units or use common areas, and (v) drawing on plaintiffs' letters of credit in the total amount of $564,600 even though Holiday Isle was in breach and plaintiffs had not defaulted.  Both sides have filed dueling motions for summary judgment as to Count Two.

---

record, and may be hotly contested at trial.  At this time, however, the Court cannot find as a matter of law that plaintiffs are unable to show that they lost their security deposits because of Holiday Isle's § 1703(c) violation; therefore, defendant is not entitled to summary judgment as to Count One.

[18]    As pleaded, Count One also alleges that Holiday Isle violated the ILSFDA in ways other than omission of the mandatory § 1703(c) language.  In particular, Count One alleges that Holiday Isle "failed to register the Condominium Project" with HUD, that it "failed to provide the Plaintiffs with the printed property report," and that it "included language in the Contract specifically designed to avoid the application of the ILSFDA."  (Complaint, at ¶ 51.)  The record is devoid of evidence that plaintiffs sustained damage as a result of these other alleged violations; therefore, as to those aspects of Count One, defendant's Motion is **granted**.  The only portion of Count One that will proceed to trial is plaintiffs' claim for damages arising from defendant's nondisclosure of their right to rescind if no property report were provided.

-16-

A.      *Relevant Facts.*

1.      *The Preconstruction Purchase and Escrow Agreements.*

The parties are in agreement as to most of the facts concerning the purchase agreements, including such matters as who drafted them, who executed them, when their effective dates were, and what their contents were.  For instance, it is undisputed that Holiday Isle prepared the "Preconstruction Purchase and Escrow Agreements" (the "Agreements") at issue.  (Doc. 65, Plaintiffs' Exh. 3, at #6.)  It is likewise undisputed that all plaintiffs and Holiday Isle signed their respective Agreements in February and March 2005, except that plaintiff Fitzner's Agreement was not executed by Holiday Isle until later.  Specifically, plaintiffs John and Tracey Gardner signed their Agreement to purchase Unit 102 on March 3, 2005, with Holiday Isle executing same on March 7, 2005.  (Wesch Aff (doc. 69-2), at Exh. A.)  Plaintiff Arthur Fitzner signed his Agreement to purchase Unit 121 on March 3, 2005, with Holiday Isle  following suit on July 14, 2005.  (*Id.* at Exh. B.)[19]  Plaintiff Richard Murray signed his Agreement to purchase Unit 122 on February 22, 2005, with Holiday Isle executing same on March 7, 2005.  (*Id.* at Exh. C.)  Plaintiffs Lisa and Jay Murray signed their Agreement to purchase Unit 706 on February 27, 2005, and Holiday Isle signed it on March 7, 2005.  (*Id.* at Exh. D.)[20]  Finally, plaintiff Celeste Taylor signed her Agreement to purchase Unit 203 on February 28, 2005, with Holiday Isle

---

[19]      The Fitzner Agreement reflects an execution date by Holiday Isle of July 14, 2005.  However, the Affidavit of Paul C. Wesch, who signed the Fitzner Agreement on Holiday Isle's behalf, includes the following statement:  "I signed the Holiday Isle Agreement with Arthur Fitzner on July 14, 2007."  (Wesch Aff., ¶ 5.)  This is an obvious typographical error, and all parties are in agreement that the actual signing date by Holiday Isle is July 14, 2005.  (*See* Plaintiffs' Brief (doc. 66), at 3; Defendant's Brief (doc. 59), at 2.)  Thus, notwithstanding the error in the Wesch Affidavit, there is no genuine dispute as to the date of execution of the Fitzner Agreement.

[20]      On its face, this Agreement was between Holiday Isle and Lisa Murray, with Jay Murray not being defined as a "Purchaser" on page 1.  (*Id.*)  In the signature blocks on page 25, however, both Lisa and Jay Murray signed the Agreement as "Purchasers."  No party has disputed that plaintiff Jay Murray is in fact a signatory of and a party to the Unit 706 Agreement; therefore, the Court finds for purposes of this Order that he was in fact party to that Agreement.

executing that Agreement on February 4, 2005.  (*Id.* at Exh. E.)[21]

Each Agreement required the purchaser to pay an earnest money deposit of 20% of the purchase price upon execution, such amount to be held by an escrow agent, with the balance due at closing.  (Agreements, ¶ 2(a).)  To satisfy the deposit requirement, the Agreements granted purchasers the option of delivering to Holiday Isle a standby letter of credit, in lieu of cash.  (*Id.*, ¶ 2(b).)  All plaintiffs in this case selected the letter of credit option, and timely furnished said letters of credit to Holiday Isle.  By the terms of the Agreements, "Upon the occurrence of a default by Purchaser under this Agreement, [Holiday Isle] and/or Escrow Agent shall immediately draw on the existing Letter of Credit in whole and create with the proceeds thereof a cash Deposit to be placed with Escrow Agent, with said funds to be delivered to [Holiday Isle] as liquidated damages."  (*Id.*, ¶ 2(b).)

The Agreements were clear that Holiday Isle reserved "absolute discretion as to whether or not to proceed with the development of the Condominium."  (*Id.*, ¶ 6(B).)  To protect the purchaser in the event that either Holiday Isle opted not to proceed or the construction process was significantly delayed (with or without fault or malfeasance by Holiday Isle), Paragraph 6(B) of the Agreements provided as follows:

> "If the Unit herein purchased shall not be completed within two (2) years of the effective date of this Agreement, this Agreement shall be null and void and all monies paid hereunder, together with interest accrued thereon, shall be refunded to Purchaser.  For the purposes of this section, the effective date of this agreement is the date of its execution or April 1, 2005, whichever occurs later."

(*Id.*)  It being undisputed that all plaintiffs' Agreements except for Fitzner's were executed prior to April 1, 2005, their effective date was April 1, 2005, such that Paragraph 6(B) rendered those Agreements null and void unless the "Unit" was "completed" by April 1, 2007.  The corresponding completion deadline for Fitzner's Unit was July 14, 2007, two years after his Agreement was executed by Holiday Isle.

---

[21]      Notwithstanding the existence of five distinct Purchase Agreements for five different units, those Agreements may be considered and analyzed collectively for summary judgment purposes.  No party has identified material differences in the terms of those Agreements that might warrant a document-by-document approach; moreover, review of the Agreements reflects that they are all substantially similar in content and form.

Other sections of the Agreements established the parties' respective rights and obligations concerning closing and default.  According to Paragraph 11(a):

 "Purchaser will be required to close upon the issuance of the certificate of occupancy and recordation of the Condominium Documents.  Provided, however, anything else herein contained to the contrary, no interest in the Unit may be conveyed or voted until the Declaration of Condominium is recorded and the Unit is substantially completed, as evidenced by a recorded certificate of substantial completion executed by an independent registered architect or independent registered engineer or by issuance of a certificate of occupancy authorized by law."

(Agreements, ¶ 11(a).)[22]  The Agreements provided that the consequences of the purchasers' failure to close depended on the circumstances for that failure.  If a purchaser failed to close on the appointed date with at least 10 days prior notice, and if Holiday Isle were not in default, then all letter of credit proceeds and other funds in the purchaser's escrow account "shall be paid to [Holiday Isle] as liquidated and agreed upon damages."  (*Id.*)  If, however, a purchaser failed to close because of Holiday Isle's failure to tender compliance with its obligations on the closing date, then the purchaser's escrow funds "shall be returned to the Purchaser, in which event this Agreement shall be at an end, and neither party shall owe the other further duty or obligation hereunder.  Rescission of the Agreement and return to the Purchaser of the monies held in escrow shall be Purchaser's sole remedy for default of [Holiday Isle]."  (*Id.*)

## 2.     *Status of the Project in Early 2007.*

On March 28, 2007, the Town of Dauphin Island issued a Certificate of Occupancy ("CO") for the Project.  The CO reflected that a final inspection had been completed on that date and that the structure was built according to plans submitted.  The CO further stated as follows: "This Certificate of Occupancy is approved based on the terms of agreement with the Town of Dauphin Island and The Mitchell Company [the Manager of Holiday Isle] as specified by

---

[22]     "Condominium Documents," a defined term in the Agreements, collectively refers to the following materials: (a) the Offering Statement; (b) the Proposed Declaration with Exhibits attached; (c) Proposed Articles of Incorporation of the Holiday Isle Owners Association, Inc; (d) Proposed By-Laws; (e) Rules and Regulations of the Association; (f) the Association's projected budget; (g) the Agreement itself; and (h) Acknowledgment. (Agreements, ¶ 5.)  On its face, the Agreement "is subject to all of the terms, conditions and stipulations of the Condominium Documents."  (*Id.*)

Spectrum and Associates that limit t [*sic*] occupancy of private units only NO COMMON SPACES." (Doc. 73, Plaintiffs' Exh. C.) All parties are in agreement that the "NO COMMON SPACES" exclusion was warranted given that many of the Project's amenities were still under heavy construction in late March 2007. The March 28 CO was signed by Joyce Allen, Building Inspector for the Town of Dauphin Island. (*Id.*; Allen Dep., at 95-96.) In her deposition testimony, Allen agreed with a characterization of the March 28 CO as "a temporary CO as to the units," and verified that she had authority to revoke that CO. (Allen Dep., at 94-95.)[23] According to Allen, it is commonplace for the Town of Dauphin Island to issue temporary COs. (*Id.* at 98.)

In addition to procuring the March 28 CO, Holiday Isle took other steps in early 2007 to position the Project for closings on particular pre-sold units. Forrest Daniell, a licensed architect, issued a Certification of Completion for each of the five dwelling units at issue in this action, indicating that he had inspected them and deemed each to be "substantially complete as defined by the law of Alabama" as of March 31, 2007. (Wesch Aff., at Exh. J.)[24]

---

[23]     Allen never revoked the March 28 CO for the Project and never observed any conditions on her daily visits to the site that would have warranted revocation. (*Id.* at 106.) Hypothetically speaking, however, had the March 28 CO been revoked, unit owners and their guests would not have been permitted to occupy the building, and plaintiffs would no longer have been able to occupy their units. (Daniell Dep., at 310.)

[24]     Plaintiffs impugn these Certifications of Completion in several respects. For example, plaintiffs criticize the Certifications as "back dated." (Plaintiffs' Response (doc. 73), at 2.) But the backdating is of no consequence if, as Daniell testified, the underlying inspections occurred as of the March 31 certification date. Plaintiffs also maintain that the Certifications were the product of "reduced ... requirements" to accommodate Holiday Isle's April 1, 2007 contractual deadline for completion. (*Id.*) But Daniell's testimony on which plaintiffs rely for this point does not reflect that he ever dipped below applicable standards imposed by the Town of Dauphin Island or other governing authorities for substantial completion. (Daniell Dep., at 91.) Plaintiffs further malign these Certifications because Daniell kept no records or notes from his March 2007 inspections, yet he certified substantial completion of those units nearly three months after the fact without the benefit of contemporaneous notes. (*Id.*) This critique mischaracterizes the record evidence. Daniell testified that he made handwritten notes at the time of his March 2007 inspections, which notes he subsequently discarded (presumably after preparing the Certificates of Completion). (Daniell Dep., at 294-95.) There is thus no reason to believe, and plaintiffs have proffered no evidence establishing, that Daniell was working exclusively from memory when he prepared the Certifications of Completion.

To counter defendant's evidence concerning the status of the Project in the late March 2007 time frame, plaintiffs offer the observations of plaintiffs Taylor and Richard Murray concerning their walk-throughs of their units in or around March 2007, although precise dates for those inspections are not provided.  Taylor testified that, at the time of her walk-through, Unit 203 "was not livable."  (Taylor Dep., at 15.)  However, plaintiffs proffer no specifics to support that generalization, aside from Taylor's remarks that she saw a worker "putting a coating" on her patio, the walls appeared unpainted, and there may not have been lights in her Unit.  Richard Murray testified that during his walk-through of Unit 122, he observed "[a] half-finished product with the flooring not completed, the tile not completed.  The painting wasn't done.  The railings on the balcony were not there."  (R. Murray Dep., at 50.)  Plaintiffs offer no evidence concerning the state of the other three units at issue in this litigation during the pertinent time frame.

Be that as it may, there is no dispute that Holiday Isle caused to be recorded a 58-page document styled "Declaration of Condominium of Holiday Isle, a Condominium," in the Probate Court of Mobile County, Alabama, on April 9, 2007.  (Wesch Aff., at Exh. H.)[25]  The

Additionally, plaintiffs suggest that Allen's issuance of the March 28 CO and Daniell's issuance of Certifications of Completion for the units were circular because Allen and Daniell were each relying on the other.  (*Id.* at 3-4.)  This contention is also an unfair distortion of the record.  Allen's testimony was merely that she would not have signed the March 28 CO had Daniell not signed off on the life safety elements of the building.  (Allen Dep., at 26-27.)  She did not testify that her issuance of the CO was otherwise conjoined with Daniell's decision to issue Certificates of Completion.  Likewise, plaintiffs present no evidence that Daniell's decision to sign off on the life safety elements was prompted by anything that Allen did or failed to do; rather, they merely point to Daniell's common-sense assessment that a unit would not be "substantially complete" if no CO had been issued.  (Daniell Dep., at 310.)  In short, the circularity of which plaintiffs complain is illusory.

Plaintiffs also note that another, final Certificate of Occupancy was issued by the Town of Dauphin Island on June 22, 2007, which obviously falls outside the two-year completion period specified by the Agreements for all plaintiffs other than Fitzner.  (Plaintiffs' Exhibits (doc. 65), at Exh. 5.)  The legal implications of that June 22 CO will be addressed *infra*.

[25]      To be sure, plaintiffs criticize the Declaration as noncompliant with certain requirements of the Alabama Uniform Condominium Act, Ala. Code §§ 35-8A-101 *et seq.*  Fundamentally, however, plaintiffs "agree that Holiday Isle recorded the Declaration of Condominium on April 9, 2007."  (Doc. 73, at 9.)  The Court will address plaintiffs' arguments

-21-

Declaration was recorded in Book 6162, beginning at page 392. (*Id.*) The significance of this recordation is that Paragraph 11(a) of the Agreements specified that purchasers would be required to close upon "issuance of the certificate of occupancy and recordation of the Condominium Documents." (Agreements, ¶ 11(a).) Believing that it had satisfied both of these requirements, thanks to the March 28 CO and the April 9 recordation, Holiday Isle moved forward to schedule closings for plaintiffs' units in the spring of 2007.

> **3.      *The Closings and Holiday Isle's Draw on the Letters of Credit.***

On March 8, 2007, Holiday Isle sent letters to plaintiffs concerning their five respective units. These letters indicated that the Project was "nearing completion," that Holiday Isle wished to schedule closings for April and May 2007, and that "all units will be complete by the end of March." (Wesch Aff., at Exh. K.) The letters provided plaintiffs with instructions for how to schedule their closings, submitted a questionnaire form for plaintiffs to complete in order to expedite the closing process, and indicated that owner walk-throughs of the subject units would be scheduled in conjunction with the closings. Plaintiffs Taylor and Richard Murray participated in walk-throughs, and reported their assessment (to-wit, that the Project was months away from completion) to other plaintiffs, including Jay Murray and John Gardner. (Gardner Aff., ¶ 10; J. Murray Aff., ¶ 12.) No plaintiffs responded to Holiday Isle's invitation to schedule closings, nor is there record evidence that plaintiffs requested documentation or reassurances from Holiday Isle relative to the CO and recordation requirements of Paragraph 11(a). By all appearances, plaintiffs were simply silent.

When plaintiffs failed to schedule closings pursuant to the March 8 letters, Holiday Isle followed up on April 11, 2007 with certified letters (receipt of which was confirmed via signature at delivery) to plaintiffs setting closing dates for each of the five units on June 1, 2007, at a specific time and location. (Wesch Aff., at Exh. L.)[26] Once again, plaintiffs voiced no concerns to Holiday Isle and requested no information concerning COs or recordation. Instead, plaintiffs remained mute, and neither appeared for their scheduled closings nor contacted

---

concerning the legal implications (and alleged legal infirmities) of that recordation *infra*.

[26]      Plaintiffs "do not disagree" with this aspect of Holiday Isle's chronology. (Doc. 73, at 9.)

Holiday Isle to request alternate settings.  (Wesch Aff., ¶ 14.)  Plaintiff Richard Murray testified that he decided not to close on his unit because it "was not usable" and because he was "disenchanted" that the unit would not be ready that summer.  (R. Murray Dep., at 21.)  Other plaintiffs testified similarly.[27]  Rather than appearing for their closings, plaintiffs (by and through counsel) faxed a letter to Holiday Isle's escrow agent (albeit not the closing agent) on the designated closing date stating their position that the Agreements were null and void because the Project was not completed by April 1, 2007, further asserting plaintiffs' objection to any draw on their letters of credit or escrowed funds by Holiday Isle, and stating that plaintiffs intended to file suit concerning this contractual dispute.  (Plaintiffs' Exh. 16.)  Plaintiffs (by and through counsel) notified Holiday Isle in writing on June 5, 2007 that they deemed the Agreements null and void for failure to complete the units by April 1, 2007 and that plaintiffs were rescinding the Agreements pursuant to the ILSFDA because of Holiday Isle's failure to furnish the requisite property report.  (Doc. 1, at Exh. B.)[28]

Confronted with these circumstances, Holiday Isle concluded that plaintiffs were in default under Paragraphs 11 and 12 of the Agreements, thereby entitling Holiday Isle to draw on their letters of credit.  On August 20, 2007, Holiday Isle transmitted substantively similar letters to the banking institutions that had issued irrevocable letters of credit on plaintiffs' behalf.  In each letter, Holiday Isle certified that the sums drawn on such letters of credit were due it because plaintiffs had defaulted on their purchase agreements, such that Holiday Isle was now owed the full deposit amount.  (Plaintiffs' Exh. 17.)  Pursuant to Holiday Isle's certifications,

---

[27]     In particular, plaintiff Fitzner explained that he did not appear for his closing because "[t]he project was not complete" and that, in addition to his own four walls, he was buying amenities and common areas, which were not ready.  (Fitzner Dep., at 57-58.)  Plaintiff Taylor testified that she did not close because "[a]t the time, it was not finished.  The building was not complete with what I purchased.  The amenities, everything was not complete."  (Taylor Dep., at 32.)  Plaintiff Lisa Murray indicated that she did not close because "[t]he building wasn't ready."  (L. Murray Dep., at 46.)  The Gardners testified similarly.  (Gardner Dep., at 75.)  Significantly, plaintiffs' rationales focus on the overall state of the Project, and especially its common elements, rather than the degree of completion of their own private dwelling units.

[28]     Neither plaintiffs' June 1 letter to the escrow agent nor their June 5 correspondence to Holiday Isle identified any concerns regarding the legitimacy or sufficiency of the March 28 CO or the recordation of the Declaration of Condominium.

plaintiffs' banks turned over the full amounts of the respective letters of credit to Holiday Isle, then proceeded to seek recourse from plaintiffs to collect principal and interest on same.[29]  For its part, Holiday Isle accepted the letter of credit proceeds as liquidated damages pursuant to Paragraph 12 of the Agreements, which provides that in the event of a purchaser's default and failure to cure, Holiday Isle "may declare this contracted terminated and all monies ... committed by any Letter of Credit ... on behalf of the Purchaser, shall be paid to [Holiday Isle] as liquidated and agreed upon damages which [Holiday Isle] has sustained and suffered as a result of Purchaser's default, and thereupon the parties hereto will be released and relieved from all obligations hereunder."  (Agreements, ¶ 12.)

       **B.**    ***Analysis.***

       Although the parties' submissions sometimes conflate them, two distinct aspects of Count Two are implicated by the dueling Rule 56 motions.  The first component of Count Two is plaintiffs' request for a declaration that the Agreements are null and void by operation of Paragraph 6(B)'s two-year completion requirement.[30]  The second aspect of that cause of action is plaintiffs' request for a declaration that, even if the Agreements are not void under Paragraph 6(B), Holiday Isle breached them by wrongfully certifying that plaintiffs were in default, pursuant to Paragraphs 11 and 12, to draw on the letters of credit, when in fact plaintiffs were not in default.  Each of these issues will be addressed in turn.

---

[29]     In particular, Holiday Isle received the following: (a) $95,000 from the Fitzner letter of credit on Unit 121; (b) $95,000 from the Gardner letter of credit on Unit 102; (c) $136,800 from the Jay and Lisa Murray letter of credit on Unit 706; (d) $146,800 from the Richard Murray letter of credit on Unit 122; and (e) $91,000 from the Taylor letter of credit on Unit 203.  Those proceeds of the letters of credit (totaling $564,600), and specifically plaintiffs' attempts to recover same, lie at the heart of this dispute.

[30]     In summary judgment briefing on this issue, defendant argues that "Holiday Isle is entitled to a declaration in its favor that these Units were complete by or before the required deadline."  (Doc. 59, at 10.)  But Holiday Isle has interposed no counterclaims or causes of action for declaratory judgment in this action; therefore, this request will not be entertained because no Holiday Isle claim for declaratory relief has been joined herein.  *See generally In re Joint Eastern and Southern Dis. Asbestos Litigation*, 14 F.3d 727, 731 (2nd Cir. 1993) ("a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief").

1.    *Whether the Agreements are Null and Void under Paragraph 6(B).*

a.    *Contractual Context.*

As mentioned, Paragraph 6(B) of the Agreements creates a time element for Holiday Isle's construction efforts. In particular, that Paragraph provides as follows: "If the Unit herein purchased shall not be completed within two (2) years of the effective date of this Agreement, this Agreement shall be null and void and all monies paid hereunder, together with interest accrued thereon, shall be refunded to Purchaser." (Agreements, ¶ 6(B).) Plaintiffs say they are entitled to summary judgment on Count Two because Holiday Isle did not satisfy Paragraph 6(B). Conversely, Holiday Isle insists that it is entitled to summary judgment on Count Two because it did satisfy Paragraph 6(B).

To apply Paragraph 6(B) in this case, it is imperative to determine the meaning of the terms "Unit" and "completed," because those terms establish the parameters of Holiday Isle's temporal obligation. If Holiday Isle did not "complete" a plaintiff's "Unit" within two years after April 1, 2005 (or within two years after July 14, 2005, in the case of Fitzner),[31] then that plaintiff's Agreement is void and that plaintiff is entitled to recover his or her letter of credit proceeds. By contrast, if Holiday Isle did "complete" the plaintiff's "Unit" by the April 1, 2007 deadline (or July 14, 2007, in the case of Fitzner), then the time element of Paragraph 6(B) is satisfied and the Agreement is not null and void under that paragraph. The parties devote much of their summary judgment filings to exposition of their strenuous disagreement over the proper construction of the words "Unit" and "completed." Into that dense and treacherous thicket this Court must now tread.

b.    *Governing Legal Principles.*

The parties' briefs reflect concurrence that the Agreements are governed by Alabama

---

[31]      Paragraph 6(B) utilizes the "effective date of this Agreement" as the trigger for the two-year completion requirement, and defines the "effective date" as "the date of its execution or April 1, 2005, whichever occurs later." (Agreements, ¶ 6(B).) The Agreements of all plaintiffs other than Fitzner were executed by both sides prior to April 1, 2005, such that their effective dates were April 1, 2005. Because Holiday Isle did not sign Fitzner's Agreement until July 14, 2005 (several months after Fitzner himself had executed it), however, July 14, 2005 is the effective date of his Agreement for Paragraph 6(B) purposes.

law.[32]  Relevant tenets of contract interpretation under Alabama law include the following:  "The question whether a contractual term is ambiguous or unambiguous is a question of law for the court to decide."  *Hamilton v. Employees' Retirement System of Alabama*, --- So.2d ----, 2009 WL 129981, *3 (Ala. Jan. 16, 2009); *see also Mega Life and Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 991 (11ᵗʰ Cir. 2008) (under Alabama law, whether contract is ambiguous is a question of law for the court).  Moreover, "[i]n determining whether the language of a contract is ambiguous, courts construe the words according to the interpretation ordinary men would place on the language used therein. ... The words are given the meaning that persons with a usual and ordinary understanding would place on the words."  *Progressive Specialty Ins. Co. v. Naramore*, 950 So.2d 1138, 1141 (Ala. 2006) (citations and internal quotations omitted).  "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court."  *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted).  "General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract."  *Drummond Co. v. Walter Industries, Inc.*, 962 So.2d 753, 780 (Ala. 2006).  By contrast, "[i]f the trial court finds the contract to be ambiguous, it must employ established rules of contract construction to resolve the ambiguity," and may only submit the ambiguity to the finder of fact if application of those canons of construction proves insufficient to resolve it.  *Pieniozek*, 516 F.3d at 992 (internal quotations and citations omitted); *see also New Gourmet Concepts, Inc. v. Siedo Investments Co.*, 988 So.2d 961, 967 (Ala. 2007) ("When we find an agreement to be ambiguous, we must employ established rules of contract construction to resolve the ambiguity found in the inartfully drafted document.") (citation omitted).

Four time-honored canons of contract construction come into play here.  First, "[w]here contract terms are unambiguous, we do not look beyond the plain language of the contract to second-guess the intentions of the parties; nor will we speculate about what may have been the subjective expectations of the parties. ... It is not a function of the courts to make new contracts

---

[32]      This result finds support in the terms of the Agreements, which provide as follows: "Should any dispute arise between any of the parties whose rights or duties are affected or determined by this Purchase and Escrow Agreement, ... such dispute shall be governed by the laws of the State of Alabama."  (Agreements, ¶ 20.)

for the parties, or raise doubts where none exist." *Title Max of Birmingham, Inc. v. Edwards*, 973 So.2d 1050, 1054 n.1 (Ala. 2007) (citations and internal quotation marks omitted); *see also Turner v. West Ridge Apartments, Inc.*, 893 So.2d 332, 335 (Ala. 2004) ("A court may not make a new contract for the parties or rewrite their contract under the guise of construing it.") (citations omitted). Second, Alabama courts have long recognized that "the words of a contract are to be given their ordinary meaning." *Ex parte Keelboat Concepts, Inc.*, 938 So.2d 922, 928 (Ala. 2005) (citations omitted); *see also Brunner v. Ormsby*, --- So.2d ----, 2008 WL 748095, *5 (Ala.Civ.App. Mar. 21, 2008) (same); *Chris Myers Pontiac-GMC, Inc. v. Perot*, 991 So.2d 1281, 1284 (Ala. 2008) ("When interpreting a contract, a court should give the terms of the contract their clear and plain meaning and should presume that the parties intended to do what the terms of the agreement clearly state.") (citation omitted). Third, it is well established "that a court in seeking to ascertain the intention of the parties in construing a contract, will consider the contract as a whole, although the immediate object of the inquiry is the meaning of a particular clause." *Gulf Coast Realty Co. v. Professional Real Estate Partners, Inc.*, 926 So.2d 992, 1005 (Ala. 2005) (citations omitted). Fourth, "it is a familiar rule of contract construction that any ambiguity must be construed against the drafter of the contract." *Ex parte Palm Harbor Homes, Inc.*, 798 So.2d 656, 661 (Ala. 2001) (citations and internal quotation marks omitted); *but see FabArc Steel Supply, Inc. v. Composite Const. Systems, Inc.*, 914 So.2d 344, 357 (Ala. 2005) (cautioning against kneejerk application of this rule and limiting its use with caveat that "[i]f all other rules of contract construction fail to resolve the ambiguity, then, under the rule of *contra proferentem*, any ambiguity must be construed against the drafter of the contract") (citation omitted).

### c.      Definition of "Unit."

The first question, then, is the meaning of the term "Unit." If "Unit" means the specific, private, numbered dwelling unit, and not the purchaser's share of any common elements of the Project, then that construction favors Holiday Isle. If, however, "Unit" means both the numbered dwelling unit and the purchaser's proportional share of the Project's common areas, then plaintiffs would be entitled to summary judgment on Count Two because it is uncontroverted that certain of those common elements were not completed within the two-year window created by Paragraph 6(B). Simply put, then, the question is whether "Unit" (as used in

-27-

Paragraph 6(B)) means just the purchaser's four walls, or whether it also encompasses common elements of the Holiday Isle condominium development project.

Numerous provisions in the Purchase Agreements bolster the conclusion that the term "Unit" in Paragraph 6(B) refers only to the specific numbered dwelling unit that the purchaser was buying, and not to any common elements. Paragraph 1 defines "Unit" as "the Condominium Unit known as Unit Number _____" (Agreements, ¶ 1), corresponding to the specific unit being bought, without regard for common elements. Paragraph 6(B) references Holiday Isle's absolute discretion to "alter the total number of levels (stories) and Units" (*id.*, ¶ 6(B)), which logically could refer only to private units. Even more telling is Paragraph 8, whose heading is "The Unit." That Paragraph states that "Unit dimensions are approximate; measurements are from the inside surface of the stud walls." (*Id.*, ¶ 8.) It further indicates that "[t]he Unit will not be decorated" and that "[t]he Unit is being sold unfurnished." (*Id.*) This Paragraph 8 would not make sense if "Unit" were construed as including common elements too; after all, certain common elements were decorated and furnished, and stud-wall measurements would be meaningless for common elements. Paragraph 9 specifically distinguishes between Units and common areas by providing that Holiday Isle makes no "warranty regarding the condition of the Unit or of the common areas and facilities." (*Id.*, ¶ 9.) Paragraph 23 reiterates the distinction by describing a limited warranty "to cover latent defects in the Unit, exclusive of any common areas or common elements." (*Id.*, ¶ 23.) Thus, when the Agreements are read collectively and the subject subparagraph is examined in context, there is strong textual support for Holiday Isle's position that the "Unit" referenced in Paragraph 6(B) is simply the purchaser's four walls, and not any common elements of the Project.

Notwithstanding this straightforward reading of the contract terms, the Agreements complicate matters by providing, "All terms used herein shall have the meaning given to them in the Declaration and hereby are incorporated by reference and made a part hereof." (Agreements, ¶ 22.) By its plain terms, this unassuming bit of draftsmanship (under the guise of the innocuous heading, "Miscellaneous") obliges the Court to look beyond the four corners of the Agreements to the Declaration of Condominium for the definition of a "Unit." That Declaration provides that the term "Unit ... shall have same meaning as 'Unit' is defined in the Act. The Units are

designated on the Plans."  (Wesch Aff., Exh. H, at § 1.27.)[33]  The "Act" is also a defined term in the Declaration, meaning "the Alabama Uniform Condominium Act of 1991, *Code of Alabama* (1975), Section 25-8A-101, et seq."  (*Id.* at § 1.01.)  Thus, the follow-the-bouncing-ball analysis carries us from the Agreements to the Declaration and ultimately to the Alabama Uniform Condominium Act (the "AUCA") for the proper definition of the term "Unit."  The AUCA answers the question definitively by equating "Unit" to "[a] physical portion of the condominium designated for separate ownership or occupancy."  Ala. Code § 35-8A-103(26).  Obviously, common areas, amenities, swimming pools, tennis courts, and the like are not a "physical portion" of the Project "designated for separate ownership or occupancy"; therefore, they unquestionably would not be deemed within the scope of the "Unit" as defined by the Agreements, by way of the Declaration, by way of the AUCA.  Any remaining vestige of uncertainty as to whether the AUCA would consider common elements to be part of the "Unit" is conclusively rebutted by the statute's definition of "Common Elements" as "[a]ll portions of a condominium other than the units."  § 35-8A-103(4).[34]  The Alabama Commentary to this section reinforces that conclusion by noting that "[t]he definition of unit represents a significant change from prior law which defined a unit as including its associated common and limited common elements."  § 35-8A-103 (Alabama Commentary, ¶ 27.)  This "prior law" has been supplanted by the AUCA, which clearly differentiates common elements from "Units."

In light of the foregoing, the Court finds that common elements are unambiguously excluded from the AUCA's definition of "Unit," which is binding on the Declaration and, in turn, the Agreements by their express terms.  Accordingly, plaintiffs' position that Paragraph 6(B)'s use of the term "Unit" encompasses common elements is legally incorrect and

---

[33]     The "Plans" are defined as the site plans, floor plans, and elevations of the Project appended to the Declaration as Exhibit A.  (Wesch Aff., Exh. H, at § 1.24.)  Review of those Plans confirms that the "Units" are drawn as private dwelling units, exclusive of the common elements and limited common elements, all of which are shaded differently than the "Units" on such Plans.  (Wesch Aff., Exh. H, at Exh. A.)

[34]     This definition is echoed in the Declaration, which includes the following statement: "Common elements means all portions of the condominium other than the Units." (Wesch Aff., Exh. H, at § 1.09.)

fundamentally irreconcilable with the text of the Agreements, and especially Paragraph 22 (which provides that terms in the Agreement will have the meaning given them in the Declaration, which in turn defines "Unit" by reference to the AUCA, which in turn defines "Unit" in a manner that unambiguously excludes common elements).  As such, the only portion of the Project that must be "completed" within Paragraph 6(B)'s two-year period is each plaintiff's actual private dwelling unit, and not the amenities and common facilities.  Whether common elements were completed within two years is simply irrelevant for purposes of applying Paragraph 6(B) to Count Two.[35]

---

[35]      In so concluding, the Court has considered plaintiffs' arguments to the contrary, and has found them insufficient to create ambiguity as to the meaning of the term for purposes of Paragraph 6(B).  For the sake of completeness, plaintiffs' three principal contentions will be addressed in brief.

First, plaintiffs point out that the Articles of Incorporation of the Holiday Isle Owners Association, Inc. (the "Articles") define "Unit" for purposes of that document as "a physical portion of the Condominium designated for separate ownership or occupancy by an Owner, ... *together with the undivided interest in the Common Elements allocated to such Unit* ...." (Plaintiffs' Exhibits, Exh. 1 (doc. 65-3), at 59 ¶ 1(N) (emphasis added).)  This discrepancy is irrelevant for purposes of Paragraph 6(B).  On their face, the Agreements peg the meaning of "Units" to the Declaration of Condominium, not to the Articles.  That the Articles construe the term "Unit" more broadly is a fact devoid of analytical significance.  To be sure, the Court is well aware that the Articles were listed among the "Condominium Documents" in the Agreements, and that those Agreements were expressly "subject to all of the terms, conditions and stipulations of the Condominium Documents."  (Agreements, ¶ 5.)  But to say that the Agreements are "subject to" the terms and conditions of the Articles is a far cry from concluding (as plaintiffs would have the Court do) that every term used in the Agreements must be defined by reference to the Articles.  Nothing in Paragraph 5 would support a finding that one must or should look to the Articles to divine the meaning of "Unit" or any other term in the Agreements.  Plaintiffs' argument to the contrary stretches the Agreement beyond any reasonable construction, particularly where Paragraph 22 expressly links all terms used in the Agreements to their meaning in the Declaration, not the Articles.  Plaintiffs cannot prevail in their stance that this Court should effectively strike Paragraph 22 from the Agreements and cut from whole cloth a nonexistent provision soldering the Agreements' terminology to the Articles' definitions.

Second, plaintiffs rely on portions of the AUCA providing that appurtenant common elements travel with a unit.  *See, e.g.,* Ala. Code § 35-8A-207(e) (providing that interest in common elements of condominium cannot be conveyed or transferred without the unit to which that interest is allocated); § 35-8A-103(27) (Alabama Commentary) ("Because the interests are inextricable, a deed which describes the interest being transferred as a 'unit' shall be deemed to include the unit's appurtenant associated common and limited common elements.").  But that's a different issue.  Merely because private dwelling units and fractional undivided interests in

### d.      Definition of "Completed."

The next definitional quagmire which the parties traverse in their summary judgment submissions concerns the term "completed."  Under Paragraph 6(B), the Agreements are null and void if plaintiffs' Units were not "completed" by April 1, 2007 (or, in the case of plaintiff Fitzner, by July 14, 2007).  Having ascertained what "Unit" means, the Court now confronts the question of what "completed" means.

In its summary judgment motion, Holiday Isle presents neither evidence nor argument that Units 102, 121, 122, 203, and 706 were fully and finally complete by the Paragraph 6(B) deadline.[36]  Instead, defendant repeatedly argues that the term "completed" in Paragraph 6(B) actually means "substantially completed," affording Holiday Isle a great deal more latitude in satisfying the two-year deadline.  According to Holiday Isle, because plaintiffs' Units were substantially completed as of the April 1, 2007 deadline (July 14, 2007, in the case of Fitzner),

---

common elements are bound together in conveyances does not imply that the common elements are definitionally part of the "Unit" in Paragraph 6(B), or that the "Unit" in that paragraph must encompass both the private unit and the common elements.  Certainly, a purchaser's ownership of both his private dwelling unit and a fractional share of the common elements does not override the statutory and contractual definitions of "Unit" and "Common Elements" as being mutually exclusive.  As stated above, the meaning of "Unit" in the Agreements is driven by the meaning of the term in the AUCA, and that statutory definition undeniably excludes common elements.  None of the AUCA provisions or commentary cited by plaintiffs effectively undermine that conclusion or create any ambiguity as to the proper statutory definition.

Third, plaintiffs would have the Court find from Paragraph 1 of the Agreements that "Unit" necessarily includes the appurtenant common elements because the purchase price covers not just the purchaser's private dwelling space, but also a percentage ownership share of the Project's common elements.  Of course, Alabama law requires the Agreements to be read in their entirety, rather than focusing on one clause in isolation.  *See, e.g., Fadalla v. Fadalla*, 929 So.2d 429 (Ala. 2005) ("[A] contract is to be construed in its entirety and not solely on a single provision.") (citation omitted).  As discussed *supra*, when the Agreements are read as a whole, there is no room to doubt that the term "Unit" as used in Paragraph 6(B) is intended to encompass only the particular, numbered dwelling unit and not the purchaser's fractional share in amenities and common areas.

[36]      In fact, Holiday Isle hints that the opposite may be true, allowing that it "might not have performed as to every detail" as of the Paragraph 6(B) deadline.  (Doc. 59, at 15.)

Paragraph 6(B) does not apply and the Agreements are not null and void under that provision.[37]

The inescapable defect in defendant's analysis is its unfounded insistence on equating "completion" with "substantial completion." Under fundamental contract construction principles, and in ordinary parlance, the two terms are not synonymous. Paragraph 6(B) requires that plaintiffs' Units be "completed," not "substantially completed." Moreover, the parties obviously distinguished between the two terms, given that Paragraph 11(a) prohibits conveyance of any interest in a Unit until "the Unit is substantially completed." (Agreements, ¶ 11(a).) Had the parties wished to employ the term "substantially completed" in Paragraph 6(B), they could have done so; indeed, they were obviously aware of the term "substantially completed," given its use in Paragraph 11(a). The Court must assume that the omission of the word "substantially" in Paragraph 6(B) was intentional and, similarly, that the inclusion of "substantially" in Paragraph 11(a) was not mere surplusage. This is especially true given that Holiday Isle, the drafter of these Agreements, is now urging the Court to gloss over these differences in the terminology it wrote into these documents. Furthermore, Alabama law instructs that a court interpreting a contract must give its terms "their clear and plain meaning." *Chris Myers*, 991 So.2d at 1284. The clear and plain meaning of "completed," according to a common dictionary reference, is "with no part or element lacking; free from deficiency; entire; perfect; consummate." *Webster's Revised Unabridged Dictionary*. This clear, plain meaning of the term cannot be squared with the "substantially completed" concept pressed by Holiday Isle. Simply put, in ordinary parlance, "completed" means fully and finally completed, with nothing left to be done. This Court cannot and will not rewrite Paragraph 6(B) to say that the lesser threshold of "substantial completion" of the Units is all that is necessary within the two-year build period, where the clear and plain meaning of the terminology used in the Agreements is otherwise.

In championing a more lenient "substantial completion" formulation of Paragraph 6(B), Holiday Isle directs the Court's attention to the strand of Alabama authorities recognizing that "substantial performance of [a building contract] will support a recovery on the contract where in

---

[37]      As evidence of substantial completion, Holiday Isle points to the CO issued by the Town of Dauphin Island on March 28, 2007 and covering the subject dwelling units, as well as architect Daniell's certifications that, as of March 31, 2007, each plaintiff's Unit was "substantially complete" within the meaning of Alabama law.

effect the owner has accepted the building. ... Substantial performance does not contemplate a full or exact performance in every slight or unimportant detail but performance of all important parts." *Rogers & Willard, Inc. v. Harwood*, --- So.2d ----, 2007 WL 2684542, *8 (Ala.Civ.App. Sept. 14, 2007) (citations omitted);[38] *see also Miles v. Moore*, 79 So.2d 432, 445 (Ala. 1955) ("We hold that where a contract is substantially performed by one party and the benefits thereof retained by the other, recovery may be had ... although the proof shows only a substantial performance."). In other words, the doctrine of substantial performance provides that if a contractor erects a building, and the owner moves in or otherwise accepts it, the owner cannot then refuse to pay the contractor on the technicality of minor deviations in performance as to slight or unimportant details, so long as the contractor performed as to all the important parts.

Holiday Isle's reliance on these authorities is mystifying for two reasons. First, it imputes a legal, specialized definition to the term "completed" that is in stark conflict with the plain, ordinary meaning of the term which Alabama rules of contract construction oblige this Court to apply.[39] Second, and more fundamentally, Holiday Isle selectively overlooks the portions of the authorities it cites wherein Alabama courts have narrowed the circumstances in which the "substantial performance" doctrine applies. This doctrine allows a contractor to recover for its not-quite-complete performance under a contract where the other party has accepted the building or otherwise retained the benefits of the contractor's work. *See Miles*, 79 So.2d at 445 (substantial performance applies where one party substantially performs "and the benefits thereof [are] retained by the other"); *Rogers & Willard*, 2007 WL 2684542, at *8

---

[38]    *Rogers & Willard* quoted testimony taken in that case confirming the common-sense divergence between notions of "completion" and "substantial completion," to-wit: Substantial completion "does not mean the building is 100 percent finished. It just means that everything the building is intended to be used for can be used. But it doesn't mean that there aren't punch-list items to be taken care of, such as paint blemishes, things that need to be repaired and that kind of thing." 2007 WL 2684542, at *3.

[39]    As Holiday Isle explains, "[s]ubstantial completion is a term of art ... in the construction industry." (Doc. 59, at 16.) But well-settled contract construction principles forbid this Court from applying a specialized "term of art" meaning to a contractual term where the parties have expressed no intent that it be construed in that manner. Instead, the plain and ordinary meaning of the term must be adopted.

(noting that substantial performance allows recovery on contract "where in effect the owner has accepted the building").  In the case at bar, however, plaintiffs refused to accept the Units and retained no benefits from the work performed by Holiday Isle.  The substantial performance cases cited by Holiday Isle have no application in these circumstances.  *See generally Bentley Systems, Inc. v. Intergraph Corp.*, 922 So.2d 61, 90-91 (Ala. 2005) (agreeing that counterclaim defendant cannot invoke doctrine of substantial performance as a defense against relief sought by counterclaim plaintiff "because it is not the party seeking relief, and that the doctrine of substantial performance simply has no applicability to the facts of this case").  Defendant's construction of "completed" in Paragraph 6(B) as meaning "substantially completed" is untenable, as a matter of law.  Therefore, notwithstanding defendant's largely unchallenged evidence of substantial completion, Holiday Isle's Motion for Summary Judgment is **denied** insofar as it seeks to bar plaintiffs from obtaining a declaration that the Agreements are null and void under Paragraph 6(B).[40]

By contrast, plaintiffs maintain in their summary judgment motion that the Units were not completed within the meaning of Paragraph 6(B) by April 1, 2007 (July 14, 2007 in the case of Fitzner), and that they are therefore entitled to a declaration that the Agreements are null and

---

[40]    Although the parties did not cite it, the Court's own research revealed the case of *Dodson v. Fannon*, 368 So.2d 270 (Ala. 1979), wherein the Alabama Supreme Court had occasion to examine a procedural clause in a housing subdivision's restrictive covenants providing that "if no suit to enjoin the construction [of a new house in the subdivision] has been commenced prior to the completion thereof, ... the related covenants shall be deemed to have been complied with."  *Id.* at 271.  In *Dodson*, homeowners sued the owner of a new house for violation of the restrictive covenants before the house was fully constructed but after substantial completion (*i.e.*, the building still required touch-up painting, splashblocks and a doorbell).  The trial court strictly defined the word "completed" and found that it was not too late for the homeowners to file suit over violation of the covenants because the house was not entirely complete, given the minor work that had not yet been done at the time when suit was filed.  The Alabama Supreme Court reversed, reasoning as follows: "We hold that the word 'complete,' when used in restrictive covenants of this nature, means that the building has reached that stage in its construction when it can be put to the use for which it is intended, that is, it is Substantially complete."  *Id.* at 272.  On its face, the *Dodson* holding is limited to the restrictive covenant context, rather than a run-of-the-mill contractual setting; therefore, the Court perceives no basis (and Holiday Isle has argued none) for extending its holding to the purchase and sale agreement context, where Alabama canons of contract construction would dictate a contrary result, as described herein.

void under that provision.  For the reasons stated above, the Court agrees with plaintiffs that the applicable Paragraph 6(B) inquiry is whether construction of the Units was finished (not merely "substantially completed") within the applicable time frame.  The critical questions, then, are as follows: What was the condition of Units 102, 122, 203 and 706 on April 1, 2007, and what was the condition of Unit 121 (Fitzner's unit) on July 14, 2007?  If all work on those Units was completed by the respective deadline dates, then Holiday Isle satisfied the Paragraph 6(B) time element and that paragraph does not operate to void the Agreements.  But if work was still ongoing on those Units (again, meaning the private dwelling units themselves) as of those deadlines, then the Agreements are null and void and plaintiffs are entitled to their money back.

Unfortunately, the parties proffer precious little record evidence to shed light on this vital factual matter.  Plaintiffs state in general terms that "there is no dispute that it was not complete."  (Doc. 66, at 11.)  Defendant counters with an equally general statement that it has "vigorously disputed Plaintiffs' bare claims that the units were not complete by April 1, 2007 (or July 14 for Fitzner).  The units were complete even under Plaintiffs' definition of 'complete.'" (Doc. 76, at 14-15.)  Neither of these bald, conclusory, unhelpful statements is supported by record citations of any kind.  Because it is plaintiffs' motion for summary judgment (defendants' motion having been predicated on the "substantially completed" angle), it is plaintiffs' "initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark,* 929 F.2d at 608.  The Court therefore examines plaintiffs' specific evidentiary showing concerning whether the Units were complete as of April 1, 2007 (or July 14, 2007, for Fitzner).

Plaintiffs point to the deposition testimony of Richard Murray and Celeste Taylor concerning their observations during walk-throughs of their Units.  Richard Murray testified that when he conducted a walk-through of Unit 122, he saw "[a] half-finished product with the flooring not completed, the tile not completed.  The painting wasn't done.  The railings on the balcony were not there."  (R. Murray Dep., at 50.)[41]  But he did not recall the date of that walk-

_____

[41]     Although the parties have not briefed this question, the condition of Unit 122's balcony would appear to be irrelevant.  The Declaration describes the balconies and patios abutting condominium Units as "Limited Common Elements appurtenant to those Units" rather than part of the Units themselves.  (Wesch Aff., Exh. H, at § 2.11.)  Moreover, the AUCA

-35-

through.  (*Id.* at 21.)  This testimony may show that Unit 122 was not complete when Richard Murray conducted the walk-through, but it does not establish that there are no issues of fact as to the condition of that Unit on April 1, 2007, which is the only relevant date for that Unit under Paragraph 6(B).  Likewise, Celeste Taylor testified that when she conducted a walk-through of Unit 203 in late March or early April 2007, she saw a Unit that "was not livable" because a workman was "putting on a coating" on the patio, "the walls didn't look like they had been painted," and she didn't "think we had lights in there."  (Taylor Dep., at 14-16.)[42]  Such testimony tends to show that Unit 203 was not complete at the time of Taylor's walk-through, but does not refute issues of material fact as to whether it had been completed as of April 1, 2007.[43]

Plaintiffs' other evidence includes a 27-minute DVD recorded by Jay Murray and depicting images of the status of the Project at various dates in April 2007, the earliest being April 8, 2007.  (J. Murray Aff., ¶ 13 & DVD exhibit.)  While the video (which the Court has viewed) certainly reflects that the Project was incomplete and that significant construction work

----

defines "limited common elements" as "[a] portion of the common elements" rather than as a part of the Units.  Ala. Code § 35-8A-103(16).  Plaintiffs submit no explanation for why limited common elements should be treated differently than other common elements for purposes of applying the Paragraph 6(B) time element.  The Court having found that the state of completion of common elements is irrelevant for purposes of Holiday Isle's two-year obligation under Paragraph 6(B), the same finding logically applies to the state of completion of limited common elements such as balconies and patios, which are after all a portion of the common elements.

[42]     To the extent that Taylor's complaint about Unit 203 was that its patio was incomplete, such an observation has no bearing on the Paragraph 6(B) inquiry because, as discussed in footnote 41, *supra*, patios and balconies are "limited common elements" that are definitionally distinct from the "Units" referenced in Paragraph 6(B).  Stated differently, the time element governs only completion of the Units themselves, and not the appurtenant common elements (swimming pools, tennis courts) and limited common elements (balconies, patios).

[43]     The record evidence concerning the status of the other three Units on the Paragraph 6(B) deadline date is even weaker because none of those plaintiffs conducted walk-throughs.  Jay Murray testified that he never saw the inside of his unit.  (J. Murray Dep., at 42-43.)  Lisa Murray testified that she had never been on the premises.  (L. Murray Dep., at 44.)  Fitzner testified that he did not have any idea what the inside of Unit 121 looked like as of April 1, 2007.  (Fitzner Dep., at 38-39.)  And the Gardners never saw the inside of Unit 102.  (Gardner Dep., at 89.)

was ongoing on various aspects of the premises after April 1, it does not reveal specifically the state of completion of Units 102, 121, 122, 203 and 706 for Paragraph 6(B) purposes.  To show that the Project was incomplete as of April 1, 2007 is factually and logically distinct from proving that these particular Units were not complete as of that date.  Additionally, plaintiffs rely on a June 7, 2007 letter from The Mitchell Company (Holiday Isle's manager) to its contractor, W.G. Yates & Son Construction Company, concerning the status of the project.  (Plaintiffs' Exh. 2, at HI-001047-1049.)  The June 7 letter complained about a variety of punch list items that had not been properly completed, such as (a) poor condition of wood work and door facings "in almost every unit"; (b) "Berber carpet has runs in most of the units"; (c) "Unacceptable and inconsistent blown ceiling texture"; (d) "Slider framing for doors damaged"; (e) "tack strips push through carpet"; (f) "Window frames need touch up"; (g) "Granite chipped in a number of units"; and (h) cleaning necessary in areas such as hard surfaces, light fixtures, cabinets, exterior windows, utility areas, doors and hallways.  (*Id.*)  While the June 7 letter may have been a sharp rebuke from Holiday Isle to its contractor articulating numerous aspects in which the Project remained incomplete, nothing in that letter directly addressed the condition (or, more precisely, the completeness or lack thereof) of Units 102, 121, 122, 203 and 706.[44]  Finally, plaintiffs rely on testimony from other proceedings that as of April 10, 2007, construction crews at Holiday Isle were "[i]nstalling tile in units."  (Doc. 98, Exh. 1, at 674-76.)  But which units?  Nothing in the cited testimony specifically discusses the state of completion of Units 102, 121, 122, 203 and 706.[45]

---

[44]     The same applies to an early August 2007 email exchange referenced by plaintiffs regarding dehumidifiers in the units.  (Plaintiffs' Exh. 2, at HI-001065.)  These emails discuss possible means of mounting dehumidifiers at Holiday Isle, but leave unanswered questions such as (a) whether dehumidifiers were intended for all units (including plaintiffs' Units) or just some of them, (b) whether dehumidifiers had already been installed in any units (including specifically plaintiffs' Units), and (c) whether installation of the dehumidifiers was a post-closing add-on or a part of the original construction of those units that must be performed in order for such units to be complete.  Plaintiffs' summary judgment submissions do not address any of these questions, rendering it impossible to draw meaningful conclusions as to the significance (if any) of the dehumidifier correspondence.

[45]     In contrast to plaintiffs' showing, there is substantial record evidence that at least certain Units were fully complete as of April 1, 2007.  Indeed, defendant offers the Affidavit of

In short, plaintiffs have failed to meet their initial burden on summary judgment of coming forward with record evidence showing an absence of genuine issues of fact as to whether their Units were or were not completed as of April 1, 2007 (or July 14, 2007, for Fitzner's Unit). To be sure, plaintiffs' evidence may support reasonable inferences (and persuasive ones, at that) that their Units were not fully and finally completed by the Paragraph 6(B) deadline. Two of the Units were not finished at the time of the walk-through, which apparently occurred shortly before the deadline. Well into April, the Project was an active construction site with substantial work being done on the premises. Even in June 2007, Holiday Isle's manager was dissatisfied at the incomplete punch list items (many of which related to units rather than common elements). But conflicting inferences may also be drawn from these facts. Plaintiffs have not made a satisfactory showing that there are no material issues of fact as to whether the subject Units were "completed" prior to the Paragraph 6(B) deadline. As such, it is the finding of this Court that plaintiffs have not met their initial burden on summary judgment, at least as to the portion of their Motion seeking a declaration that the Agreements are null and void pursuant to Paragraph 6(B). Plaintiffs' Motion for Summary Judgment is **denied** in that respect.

### 2.    *Whether Plaintiffs are in Default under Paragraphs 11 and 12.*

The other aspect of Count Two to which plaintiffs' (but not defendant's) Motion for Summary Judgment is directed concerns Count Two's request for a declaration that Holiday Isle was not entitled under the Agreements to draw on plaintiffs' letters of credit because plaintiffs were not in default under Paragraphs 11 and 12.[46]  Of course, if plaintiffs prevail at trial as to the

---

Samford T. Myers, who purchased Unit 314 of the Project and avers that during the walk-through of his Unit in late March 2007, he found that "[o]ur unit was complete and ready to move in and enjoy. We addressed minor cosmetic issues, which were fixed immediately." (Myers Aff. (doc. 100, Exh. 5), ¶¶ 3-4.)  This evidence reflects that, notwithstanding the well-documented problems and defects with other aspects of the Project as of early April 2007, at least Unit 314 was fully completed by April 1, 2007. Thus, the record leaves substantial doubt that all Units were incomplete at that time, and defendant's evidence affirmatively reflects otherwise.

[46]    In its Motion, Holiday Isle focuses exclusively on the Paragraph 6(B) aspect of Count Two, and does not address plaintiffs' contention that they were not in default because Holiday Isle had failed to satisfy the Paragraph 11 prerequisites for closing. Indeed, when plaintiffs asserted these issues in their opposition brief, defendant dismissively waved them aside

aspect of Count Two seeking a declaration that the Agreements were null and void under Paragraph 6(B), then the propriety of Holiday Isle's default proceedings becomes moot because there were no valid Agreements between the parties as to which plaintiffs could be in default.  If, however, plaintiffs are unsuccessful at trial in establishing that the Agreements were null and void pursuant to Paragraph 6(B), then the question of Holiday Isle's right to draw on their letters of credit pursuant to Paragraphs 11 and 12 comes to the fore.  In the interest of narrowing the issues for trial in advance as much as possible, the Court will address the default / letter of credit aspect of Count Two notwithstanding the potential that a finding at trial that the Agreements were null and void under Paragraph 6(B) would obviate the need to adjudicate these default/closing issues altogether.

As the Court understands it, plaintiffs' position is that Holiday Isle had no right to force them to close on June 1, 2007 because Holiday Isle had not satisfied the contractual prerequisites

---

as "irrelevant statements of imagined disputes," and responded to them only using an inapplicable Paragraph 6(B) framework.  (Doc. 99, at 13.)  Furthermore, in response to plaintiffs' Motion for Summary Judgment raising these same default/closing issues, Holiday Isle stated, "this is new, but irrelevant."  (Doc. 76, at 15.)  The Court disagrees.  Count Two specifically joins these issues via allegations that "Holiday Isle is not entitled to close on the subject units" (Complaint, ¶ 56) and requests that a declaration be issued regarding Holiday Isle's act of "present[ing] drafts to issuing banks on the standby letters of credit stating that Plaintiffs were in default under their contracts" (*id.*, ¶ 58).  A reasonable reading of the Complaint reflects that plaintiffs have indeed joined as issues in this litigation whether Holiday Isle was entitled to set closings on plaintiffs' Units and whether Holiday Isle's certifications to plaintiffs' lenders that plaintiffs were in default and subsequent draw on their letters of credit were contractually permissible.  The Court now considers plaintiffs' Motion as to this theory.  That said, given the extensive briefing and the complete evidentiary record on the subject of whether the Paragraph 11 prerequisites for a default were in place, the Court will also consider, *sua sponte*, whether defendant is entitled to summary judgment on these questions.  *See Artistic Entertainment, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201-02 (11ᵗʰ Cir. 2003) ("where a legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided"); *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Roberts Bros., Inc.*, 550 F. Supp.2d 1295, 1311 (S.D. Ala. 2008) (granting summary judgment to non-movant, even in the absence of cross-motion for summary judgment, as to "legal issue [that] has been fully developed and decided by this Court, such that there is no conceivable need for this action to proceed to trial" on that basis).

for closing.[47]  Because the Agreements did not require closing in these circumstances, plaintiffs continue, Holiday Isle likewise could not deem them in default for failing to close and therefore could not properly certify to plaintiffs' bankers that plaintiffs were in default so as to access their letters of credit.  By contrast, Holiday Isle's position is that it fully comported with the contractual requirements for closing, that it was entitled to deem plaintiffs in default when they refused to close on June 1, 2007, and that its draw on the letters of credit was entirely proper and permissible under the liquidated damages framework established in the Agreements.

The Agreements provide that plaintiffs were required to close on their Units "upon the issuance of the certificate of occupancy and recordation of the Condominium Documents," subject to the limitation that no interest in any Unit could be conveyed to plaintiffs "until the Declaration of Condominium is recorded and the Unit is substantially completed, as evidenced by a recorded certificate of substantial completion executed by an independent registered architect or independent registered engineer or by issuance of a certificate of occupancy authorized by law."  (Agreements, ¶ 11(a).)  Thus, Paragraph 11(a) sets forth the following prerequisites for closing: (a) issuance of a certificate of occupancy; (b) recordation of the Declaration of Condominium; and (c) substantial completion of the Unit, as evidenced by either a recorded certificate of completion or issuance of a certificate of occupancy authorized by law. The summary judgment record, even viewed in the light most favorable to plaintiffs, reveals that all of these Paragraph 11(a) criteria were satisfied as to each plaintiff and that defendant is entitled to judgment as a matter of law on these questions.

---

[47]      There is no indication that plaintiffs ever placed Holiday Isle on notice prior to the filing of this lawsuit of their position that the Paragraph 11 prerequisites for deeming plaintiffs in default and drawing on the letters of credit had not been satisfied.  Instead, it appears that plaintiffs simply refused both to close and to engage in constructive dialogue with Holiday Isle about these issues.  The only explanation in the record that plaintiffs provided on June 1, 2007 for not closing was the Paragraph 6(B) "null and void" issue.  (Plaintiffs' Exh. 16.) Plaintiffs offered a similar explanation to Holiday Isle (along with their ILSFDA no-property-report argument) four days later.  (Doc. 1, at Exh. B.)  As such, it appears that the Paragraph 11 "conditions precedent to closing" issue was an after-the-fact rationale devised by plaintiffs to strengthen their hand in litigation, and that plaintiffs never afforded defendant any notice of their belief in these deficiencies (much less any opportunity to remediate same) at any time before initiating suit.

-40-

With respect to the certificate of occupancy, the Town of Dauphin Island issued a document styled "Certificate of Occupancy" for Holiday Isle on March 28, 2007.  On its face, this CO does not purport to be a "temporary" document; however, its scope is confined to "occupancy of private units only NO COMMON SPACES."  (Wesch Aff., Exh. I.)  Plaintiffs balk that Paragraph 11 "does not state that Holiday Isle can schedule a closing upon the receipt of a temporary certificate of occupancy," and assert that temporary nature of the March 28 CO stripped Holiday Isle of the contractual authority to force plaintiffs to close.  But Paragraph 11(a) does not purport to require issuance of a final certificate of occupancy prior to closing; rather, it merely provides that plaintiffs will be required to close "upon the issuance of the certificate of occupancy."  (Agreements, ¶ 11(a).)  Plaintiffs offer neither legal authority nor persuasive argument that the March 28 CO was insufficient to satisfy this requirement.  The March 28 CO was unquestionably a certificate of occupancy, and plaintiffs identify no legal or contractual basis why the term "certificate of occupancy" in Paragraph 11(a) must, should, or could reasonably be construed as applying only to final certificates of occupancy for the entire Project, rather than a certificate of occupancy for private units.[48]  Paragraph 11(a) sets issuance of the "certificate of occupancy" as a prerequisite to requiring plaintiffs to close, and the March 28 CO plainly satisfied that prerequisite because it is a certificate of occupancy.  The Court therefore finds that there are no genuine issues of material fact and that this condition precedent to closing

---

[48]     The centerpiece of plaintiffs' argument is that the "temporary" nature of the March 28 CO rendered it insufficient under Paragraph 11(a) because it "could have been revoked at any time."  (Doc. 66, at 14; *see also* doc. 98, at 12.)  It is true that the March 28 CO was revocable, but the same could be said of any "final" certificate of occupancy.  The parties agree that the Town of Dauphin Island had adopted the 2003 International Building Code ("IBC") as its building code during the relevant time period.  (Allen Dep., at 62; doc. 66, at 14, 16; doc. 99, at 13.)  By its express terms, the IBC provides that <u>any</u> certificate of occupancy is revocable by the building inspector.  *See* Defendant's Exh. 7 (doc. 100-4), at § 110.4 ("The building official is authorized to, in writing, suspend or revoke a certificate of occupancy or completion issued under the provisions of this code wherever the certificate is issued in error, or on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of this code.").  In that respect, then, neither a "final" CO nor a "temporary" CO is irrevocable, and plaintiffs' attempts to belittle the latter on the grounds that it was subject to revocation are unavailing.

was satisfied.[49]

Next, Paragraph 11(a) requires recordation of the Declaration as a prerequisite to plaintiffs being obligated to close.  As to that issue, the record unambiguously reflects that the Declaration of Condominium was recorded by Holiday Isle in Mobile County Probate Court on April 9, 2007.  (Wesch Aff., Exh. H.)  On its face, the recordation of the Declaration satisfies this requirement of Paragraph 11(a).

Plaintiffs argue, nonetheless, that mere recordation is insufficient because, as recorded, the Declaration fails to comport with all technical requirements of the AUCA.  Specifically, plaintiffs rely on the following statutory language: "A declaration ... may not be recorded unless all structural components and mechanical systems of all buildings containing or comprising any units thereby created are substantially completed in accordance with the plans, as evidenced by a recorded certificate of completion executed by an independent registered engineer or registered architect."  Ala. Code § 35-8A-201(c).  There is no dispute that Holiday Isle failed to record a "certificate of completion executed by an independent registered engineer or registered architect," such that Holiday Isle's recordation did not strictly hew to the letter of § 35-8A-201(c).  Nevertheless, this argument is a red herring, for two reasons.  First, plaintiffs identify no provision of the Agreement that excuses plaintiffs from closing unless the recordation fully complies with all technical requirements of the AUCA.  Plaintiffs would have this Court engraft statutory criteria onto a contractual provision that states only that recordation is required, without specifying any legal standard or set of technical requirements that such recordation must meet.

_____

[49]    Another important fact bolsters this conclusion.  A "final" CO was issued on June 22, 2007.  (Plaintiffs' Exh. 5.)  This was nearly two months before Holiday Isle went to plaintiffs' lenders with certifications of default.  Even if the March 28 CO were somehow inadequate to satisfy Paragraph 11(a), the June 22 CO plainly did.  It is undisputed that  plaintiffs failed and refused to close on their Units between the issuance of the June 22 CO and Holiday Isle's August 20 certification to plaintiffs' lenders that plaintiffs were in default.  Thus, even assuming plaintiffs are correct that the March 28 CO did not "count" for purposes of Paragraph 11(a) because it was temporary, the June 22 CO fulfilled that requirement and obligated plaintiffs to close.  Plaintiffs failed to close after the June 22 CO, even though Paragraph 11(a) required them to do so; therefore, even accepting plaintiffs' attacks on the March 28 CO as meritorious, Holiday Isle was fully within its contractual rights to deem plaintiffs in default and draw on the letters of credit.

-42-

There being nothing in the Agreements stating that plaintiffs will not be required to close until after recordation *in strict compliance with Ala. Code § 35-8A-201(c)*, this Court lacks authority to rewrite those contracts to impose supplemental contractual specifications and requirements for the recordation to satisfy Paragraph 11(a).

Second, even accepting plaintiffs' argument at face value, the recordation of a certificate of completion is not as rigorous and absolute a requirement as the statutory language would suggest.  Indeed, the Commissioner's Commentary to § 35-8A-201(c) cites other AUCA provisions for the proposition that recordation of completion certificates or issuance of local certificates of occupancy are alternative means of establishing that required levels of construction have been met.  Ala. Code § 35-8A-201 (Commissioner's Commentary, ¶ 8).  The Commentary further provides that, "[i]n the case of 'substantial completion,' issuance of a 'certificate of occupancy authorized by law,' as is commonly required by local ordinance or state building codes, will suffice.  Once the certificates have been recorded, or issued, as the case may be, good title to the units may be conveyed in reliance on the record."  *Id.*  Thus, the Commissioner's Commentary to § 35-8A-201 plainly provides that the "substantial completion" showing needed to record a declaration of condominium may be satisfied <u>either</u> by recordation of an architect's certificate of completion (which was not done here) <u>or</u> by issuance of certificate of occupancy authorized by law (which was).  These are alternative avenues for achieving valid recordation of the Declaration, yet plaintiffs completely overlook this provision.  In emphasizing Holiday Isle's failure to record an architect's certificate of completion, plaintiffs ignore the statute's official Commentary establishing that issuance of a certificate of occupancy (which happened on both March 28 and June 22), even without recordation of the architect's certificate, is sufficient to satisfy the "substantial completion" requirement of § 35-8A-201(c), to create the condominium, and to enable Holiday Isle to convey good title to plaintiffs.

In short, the Court readily finds that Holiday Isle had recorded the Declaration, as required by Paragraph 11(a) as a prerequisite to obliging plaintiffs to close, well before it certified to plaintiffs' lenders that plaintiffs were in default.  That aspect of Paragraph 11(a) was

satisfied, and there are no genuine issues of material fact as to that issue.[50]

       To avoid obscuring the forest by focusing on the trees, it is helpful to step back and re-examine the two critical sentences of Paragraph 11(a) setting forth the conditions precedent to closing.  The first sentence reads, "Purchaser will be required to close upon the issuance of the certificate of occupancy and the recordation of the Condominium Documents."  (Agreements, ¶ 11(a).)  There are no genuine issues of material fact that Holiday Isle procured two certificates of occupancy (one on March 28, 2007, and the other on June 22, 2007) long before certifying to plaintiffs' bankers that plaintiffs were in default.  Likewise, there are no genuine issues of material fact that the Declaration of Condominium was properly recorded on April 9, 2007, and plaintiffs have not maintained that any other categories of Condominium Documents must be recorded in order to satisfy this provision.  Plainly, then, both conditions precedent set forth in this first sentence are satisfied.

_____

[50]     In attempting to preserve material issues of fact, plaintiffs assert that "the legality of the issuance of the TCO and Mr. Daniell's backdated certificates of substantial completion are questions of fact."  (Doc. 98, at 12 n.9.)  The Court understands that plaintiffs disagree with the Town of Dauphin Island's decision to issue a Certificate of Occupancy for all units on March 28, 2007.  But nothing in the Agreements permits plaintiffs to refrain from closing simply because they disagree with the Town's exercise of discretion in that regard.  The Agreements make no allowance for purchasers to second-guess the municipality's decision to issue a CO before being brought to the closing table.  Rather, Paragraph 11(a) provides that plaintiffs are required to close upon issuance of a certificate of occupancy so long as that certificate is "authorized by law."  (Agreements, ¶ 11(a).)  In arguing that the March 28 CO was not "authorized by law," plaintiffs point to IBC § 110.3, but that provision states only that a temporary certificate of occupancy may be issued "before the completion of the entire work covered by the permit, provided that such portion or portions shall be occupied safely."  (Defendant's Exh. 7, at § 110.3.)  Plaintiffs suggest that the March 28 CO would not be "authorized by law" unless "only incidental matters, such a [*sic*] touch up painting, are remaining," (doc. 98, at 12 n.9); however, the Court perceives no legal basis for such an assertion.  Even if such a basis existed, plaintiffs have failed to show that more than "incidental construction" was remaining on any units covered by the March 28 CO.  Besides, in launching a broadside attack on the March 28 CO, plaintiffs once again lose sight of the bigger picture.  The unassailable fact remains that a second CO was issued on June 22, 2007.  Plaintiffs have not challenged whether that CO was "authorized by law"; therefore, even if for some reason there were genuine issues of fact as to the legality of the March 28 CO, as plaintiffs argue, that determination would not insulate plaintiffs from their contractual obligation to close, inasmuch as plaintiffs have identified no grounds for challenging the legality of the June 22 CO, which predated Holiday Isle's certification of default to plaintiffs' lenders by nearly two months.

The second sentence reads, in relevant part, that "no interest in the Unit may be conveyed ... until the Declaration of Condominium is recorded and the Unit is substantially completed, as evidenced by a recorded certificate of substantial completion executed by an independent registered architect or independent registered engineer or by issuance of a certificate of occupancy authorized by law."  (Agreements, ¶ 11(a).)  Again, there are no genuine issues of material fact that the Declaration of Condominium was actually recorded on April 9, 2007, or that one certificate of occupancy was issued on March 28, 2007 and another on June 22, 2007. By the terms of Paragraph 11(a), those two COs suffice to establish the "substantial completion" requirement.  The conditions precedent in the second sentence are clearly satisfied.  In sum, then, all prerequisites for closing provided by both of these sentences were met long before Holiday Isle notified plaintiffs' banks of the default and drew on their letters of credit.  As such, the Court finds that Holiday Isle is entitled to summary judgment on the aspect of Count Two addressing whether defendant violated the closing and default procedures set forth in Paragraph 11(a).[51]

---

[51]      To the extent that plaintiffs might contend (although they have not done so in their voluminous briefs) that the June 22 Certificate of Occupancy cannot be used against them herein because it issued three weeks after the June 1 closing date, the Court disagrees.  The subject language of Paragraph 11(a) recites the conditions precedent that must be satisfied for plaintiffs to "be required to close."  It does not purport to state conditions precedent to scheduling the closing.  Even assuming that plaintiffs were not "required to close" on the scheduled June 1, 2007 date because of some defect in the March 28 CO (and even though plaintiffs never told Holiday Isle that they were refusing to close on that basis), that defect was remedied by the June 22 CO, such that plaintiffs were clearly "required to close" at that time. Yet they failed and refused to close for the next two months.  Plaintiffs never having clued Holiday Isle in to any belief they might have had that the March 28 CO was insufficient to satisfy Paragraph 11(a), and plaintiffs having neglected to appear for their June 1 closings, Holiday Isle cannot be faulted for failing to schedule a second closing after the June 22 CO was issued.  Such a course of conduct would have been a pointless charade, given plaintiffs' absolute, unconditional refusal to close on June 1.  *See generally Iverson v. Xpert Tune, Inc.*, 553 So.2d 82, 88 (Ala. 1989) ("It is well established that the law does not require the doing of a futile act.").  The point is simple: Holiday Isle had complied with all of the Paragraph 11(a) conditions precedent prior to the June 1, 2007 closing date.  But even if plaintiffs are correct that the March 28 CO was inadequate to satisfy Paragraph 11(a), the Paragraph 11(a) conditions precedent to closing were still satisfied by no later than the issuance of the June 22 CO, which was nearly two months before Holiday Isle notified plaintiffs' lenders that plaintiffs were in default and drew on their letters of credit.  The Court therefore concludes that Holiday Isle's conduct with respect to certifying plaintiffs' default and drawing on plaintiffs' letters of credit did not run afoul of

-45-

The Court will therefore **dismiss** that aspect of Count Two seeking a declaration that Holiday Isle's certification to plaintiffs' lenders in August 2007 that plaintiffs were in default and its ensuing efforts to draw on the letters of credit were in violation of Paragraph 11(a) of the Agreements.

**V.      Plaintiffs' Remaining Claims (Counts Three and Four).**

      **A.      *Count Three (Conversion).***

Both sides seek summary judgment on Count Three of the Complaint, which alleges that Holiday Isle "converted funds properly belonging to Plaintiffs by presenting fraudulent drafts and refusing to place said funds in a designated escrow account." (Complaint, ¶ 64.)  The alleged fraudulent conduct upon which Count Three is predicated is Holiday Isle's certification to "Plaintiffs' lenders stating that plaintiffs were in default under the contract," but Count Three also incorporates a claim that Holiday Isle violated Alabama Code § 35-8A-410 by refusing to hold in escrow the funds drawn from plaintiffs' letters of credit.  (*Id.*, ¶¶ 61-62.)

To establish a claim of conversion in Alabama, "one must present proof of a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property.  It is well settled that money may be subject to a conversion claim, where there is an obligation to keep that money intact or deliver it."  *SouthTrust Bank v. Donely*, 925 So.2d 934, 939 (Ala. 2005) (citations omitted).  Simply stated, "[c]onversion requires a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has ... the immediate right of possession."  *Gardner v. State Farm Mut. Auto. Ins. Co.*, 842 So.2d 1, 7 (Ala.Civ.App. 2002) (quoting *Empiregas, Inc. of Gadsden v. Geary*, 431 So.2d 1258, 1260 (Ala. 1983)).

In this case, the conversion claim is redundant of, and dependent on, issues this Order has already addressed.  Whether Holiday Isle wrongfully exercised dominion over plaintiffs' funds pursuant to the letters of credit depends on whether defendant satisfied the time element of Paragraph 6(B).  If plaintiffs' Units were not completed by April 1, 2007 (or July 14, 2007, in the case of Fitzner), then the Agreements are null and void and Holiday Isle had no right to certify that plaintiffs were in default or to draw on their letters of credit to assume ownership

---

Paragraph 11(a).

-46-

over plaintiffs' security deposits.  In that event, plaintiffs would be entitled to prevail on their conversion claim.  By contrast, if plaintiffs' Units were completed by the Paragraph 6(B) deadline, then the Agreements are not null and void; moreover, as discussed *supra*, if the Paragraph 6(B) time element has been satisfied, then plaintiffs were in default and Holiday Isle was entitled to draw on their letters of credit.  In that event, plaintiffs would have no actionable claim for conversion under Alabama law because defendant's exercise of dominion over their property was not "wrongful," but was instead authorized by the terms of the Agreements.

To summarize, then, as goes plaintiffs' declaratory judgment cause of action in Count Two relating to Paragraph 6(B), so too goes their conversion claim in Count Three.  The fact issues described *supra* as to application of Paragraph 6(B) to these circumstances likewise preclude the granting of summary judgment to either side on plaintiffs' conversion cause of action.[52]

---

[52]  Notwithstanding Holiday Isle's arguments, this analysis is not affected by the Alabama Supreme Court's decision last year in *Holiday Isle, LLC v. Adkins*, --- So.2d ----, 2008 WL 2153366 (Ala. May 23, 2008).  According to defendant, the *Adkins* ruling "approved Holiday Isle's presentment of the letters of credit under the same contractual language" and "strikes a fatal blow to Plaintiffs' case on this count."  (Doc. 59, at 18, 20.)  Not so.  The *Adkins* Court was hearing Holiday Isle's appeal from a state court preliminary injunction that barred it from negotiating certain purchasers' letters of credit.  The Alabama Supreme Court reversed, reasoning that "[t]he well-reasoned jurisprudence of this Court condemning injunctions against drawing upon letters of credit is fundamental" and relying on "the universal rule that an injunction preventing a beneficiary from drawing on a letter of credit is inappropriate."  *Id.* at *6.  Far from placing its imprimatur on Holiday Isle's actions, *Adkins* merely found that issuance of a preliminary injunction under Alabama law was inappropriate.  The *Adkins* decision made no findings, and expressed no opinions, concerning whether the plaintiffs were actually in default, and expressly preserved just the sort of conversion theory that plaintiffs interpose here by explaining as follows: "If the proceeds of the letters of credit are disbursed and the purchasers' default cannot later be established, ***the purchasers' remedy is an action at law against the beneficiary of the letters of credit***."  *Id.* (emphasis added).  That precise circumstance is alleged by these plaintiffs.  There are genuine issues of fact as to whether purchasers were in default (based on the Paragraph 6(B) time element), so plaintiffs may proceed with an action at law against Holiday Isle for drawing on their letters of credit.  *Adkins* in no way forecloses such claims or insulates a developer from liability for drawing on a letter of credit based on a false certification (which is the theory animating Count Three); indeed, *Adkins* specifically recognizes the continuing vitality of such claims.  The Court therefore rejects defendant's assertion that this claim cannot "survive[] in the face of *Adkins*."  (Doc. 76, at 20.)

As for the part of Count Three alleging that Holiday Isle is in violation of Alabama Code § 35-8A-410 for refusing to place the letter of credit proceeds in a designated escrow account, the Court concurs with defendant that such a claim lacks merit and adds nothing to the conversion cause of action. To be sure, the referenced provision of the AUCA provides that "[a]ny deposit made in connection with the purchase or reservation of a unit ... shall be placed in escrow." Ala. Code § 35-8A-410. By its terms, however, the statute allows escrowed funds to be "delivered to the declarant because of purchaser's default under a contract to purchase the unit." *Id.* § 35-8A-410(ii). Moreover, the Alabama Supreme Court has explained that this section "does not operate to preclude the parties from entering into an agreement in which, in lieu of an earnest-money deposit, a standby letter of credit is issued by a neutral bank and is payable to the beneficiary *upon the purchaser's default*." *Holiday Isle, LLC v. Adkins*, --- So.2d ----, 2008 WL 2153366, *5 (Ala. May 23, 2008) (emphasis in original). In other words, if plaintiffs were in default, then nothing in § 35-8A-410 would obligate Holiday Isle to place the letter of credit proceeds in an escrow account pending final adjudication of the ensuing litigation. To the extent that plaintiffs contend in Count Three that Holiday Isle is liable under Alabama law for not maintaining the letter of credit proceeds in escrow, defendant's Motion for Summary Judgment is **granted**. If plaintiffs were in default, then Holiday Isle had every right to draw on the letters of credit and place those funds in its unilateral control. If plaintiffs were not in default, then Holiday Isle could not properly draw on the letter of credit proceeds in the first place and plaintiffs may recover on a conversion theory. Either way, the escrow issue is superfluous, and Count Three's overlay of § 35-8A-410 is ill-fitting, particularly given that the parties agreed to use letters of credit in lieu of cash deposits. That portion of Count Three is **dismissed**.[53]

---

[53]     Among the forms of relief sought by plaintiffs under Count Three are punitive damages, which are available in conversion actions under certain circumstances. *See, e.g., Industrial Technologies, Inc. v. Jacobs Bank*, 872 So.2d 819, 826 (Ala. 2003) ("Punitive damages ... are justified when the evidence discloses the conversion to have been committed in known violation of law and of owner's rights, with circumstances of insult, or contumely, or malice.") (citations omitted). In one of its briefs, Holiday Isle states as to Count Three that "there is certainly no evidence to support a claim for punitive damages, as discussed earlier (Doc. 59, at 18-20)." (Doc. 99, at 16.) The referenced pages, however, are silent as to the

**B.      Count Four (Declaratory Judgment for Plaintiff Fitzner).**

Finally, the Court must touch briefly on Count Four of the Complaint, wherein plaintiff Fitzner requests a declaration from the Court that he has no contract with Holiday Isle.  Fitzner characterizes his March 3, 2005 execution of his Agreement as an "offer," which he says Holiday Isle did not "accept" prior to June 5, 2007, when he revoked such offer.  (Complaint, ¶¶ 67-74.)  Fitzner's basis for saying that Holiday Isle did not accept is, apparently, that "he never received a signed contract" from defendant.  (*Id.*, ¶ 72.)  Defendant (but not Fitzner) has moved for summary judgment on this cause of action.

The relevant facts are that Holiday Isle presented Arthur Fitzner with the Agreement in or before early March 2005, and that Fitzner executed same on March 3, 2005.  (Wesch Aff., Exh. B.)  Although Holiday Isle signed the other plaintiffs' Agreements in February or March 2005, it did not execute Fitzner's Agreement until July 14, 2005, because of delays in Fitzner's compliance with the requirement that he provide either a letter of credit or a cash deposit.  (Wesch Aff., ¶ 5.)[54]  Holiday Isle's evidence is that it sent Fitzner a fully executed copy of his Agreement upon signing same.  (*Id.*)

In the months and years after Fitzner's execution of the Agreement, both he and Holiday Isle repeatedly manifested every outward appearance of having entered into a contract for Fitzner to purchase Unit 121.  In March 2005, Fitzner arranged for delivery of a standby letter of credit to Holiday Isle in the amount of $95,000.  (Plaintiffs' Exh. 17.)  Holiday Isle sent Fitzner, and Fitzner received from Holiday Isle, periodic updates and information concerning the progress of the Project in 2005, 2006 and 2007.  (Wesch Aff., Exhs. G & M.)  For example, a letter from Holiday Isle to Fitzner dated March 15, 2006 references "your beautiful Holiday Isle

---

punitive damages aspect of plaintiffs' conversion claim.  This Court will not develop defendant's arguments for it, or hypothesize as to the legal and record basis for its conclusory statement that punitive damages are unsustainable.  As such, defendant's unsupported, undeveloped request for summary judgment as to the punitive damages component of Count Three is **denied**.

[54]      The Fitzner letter of credit was issued by the Bank of Vernon and is dated March 3, 2005; however, there is a handwritten notation on it dated April 19, 2005 and stating: "Returned original to bank for reissue w/ sample LOC."  (Plaintiffs' Exh. 17 (doc. 65-19).)  Apparently, then, Holiday Isle delayed processing of Fitzner's paperwork pending receipt of a letter of credit that conformed to its specifications.

condominium" and states that "[w]e anticipate delivering your unit in early 2007." (*Id.*)  In April 2006, Holiday Isle sent Fitzner a letter requesting him to make selections for the color of his granite counter tops and the cabinet style and wood/stain.  (*Id.*)  Fitzner promptly responded and made specific selections from among the choices provided.  (*Id.*)  There are numerous examples in the record of similar correspondence between March 2005 and June 1, 2007.  In none of that correspondence did either Holiday Isle or Fitzner evince any perception, impression or belief that no Agreement had been entered into between them, or that Fitzner's "offer" to buy a condominium from Holiday Isle remained outstanding and unaccepted.  To the contrary, Fitzner appeared so certain that he had a contract with Holiday Isle to purchase Unit 121 that he placed a listing to resell that very unit on a multiple listing service website.  (Wesch Aff., Exh. N.)  Fitzner testified in his deposition about "what I bought with Holiday Isle" and about "[t]he reason I bought a Holiday Isle condominium" reflecting even then his understanding of the existence of a contractual arrangement between Holiday Isle and him.  (Fitzner Dep., at 57, 30.)  Fitzner said, "I bought it for rental income and personal use, both." (*Id.* at 47.)  Yet in Count Four, Fitzner alleges that he bought nothing and that there was no contract between them for the purchase of Unit 121.  In short, there is a disconnect between Count Four and Fitzner's own deposition testimony in this case.

From the undisputed facts, it is quite clear that the legal prerequisites of a contract between Holiday Isle and Fitzner are satisfied.  Under Alabama law, "[t]he requisite elements of a valid contract include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Barnett Millworks, Inc. v. Guthrie*, 974 So.2d 952, 957 (Ala. 2007).  All of those elements are present here.  Fitzner apparently challenges the existence of an acceptance on the theory that he never received the mailed, fully-executed contract from Holiday Isle.  It is true, of course, that "[n]o valid contract can exist without the acceptance of an offer." *Ex parte Bill Heard Chevrolet, Inc.*, 927 So.2d 792, 800 (Ala. 2005).  But defendant is entitled to summary judgment on Count Four for four distinct reasons.  First, and most fundamentally, plaintiff has failed to adduce any record evidence that Fitzner never received the

-50-

signed contract that Holiday Isle mailed him.[55]  Second, even if he had, Fitzner's lack of receipt of a fully executed copy of the Agreement does not negate contract formation.  Under Alabama law, "[i]t is well settled that whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions. ... Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance."  *Cook's Pest Control, Inc. v. Rebar*, 852 So.2d 730, 738 (Ala. 2002) (internal citations and quotation marks omitted).  Both Fitzner and Holiday Isle engaged in a continuous course of conduct from March 2005 through April 2007 that yields an overwhelming, unrebutted inference of assent to an agreement.  Nothing more is required under Alabama law, and Fitzner has adduced no record evidence that might create a factual dispute as to whether there was mutual assent between the parties.  Third, Fitzner's characterization of his signature on the Holiday Isle-drafted Agreement as a mere "offer" to purchase Unit 121, rather than an acceptance of Holiday Isle's offer to sell it to him, is an unreasonable distortion of what transpired and is devoid of factual or legal support.  Fourth, even if Fitzner were correct that his signature on the Agreement was an "offer" and that he never received Holiday Isle's acceptance of same, it remains an undisputed fact that Holiday Isle promptly mailed the fully executed document back to him.  By operation of the mailbox rule under well-established hornbook law, whether Fitzner ultimately received that mailing or not is irrelevant to contract formation.  *See, e.g., Moseley v. First Community Bank*, 649 So.2d 1274, 1276 (Ala. 1994) ("When a contract is made or [an] unqualified proposal [is] accepted by the letter of the promisor, it is complete and takes effect the moment the same is deposited and duly posted in the post office.") (citation omitted); 2 *Williston on Contracts* § 6:32 (4th ed.) ("It was long ago decided that the contract was completed on the mailing of the acceptance .... Under this view, it is immaterial that the

---

[55]    At most, plaintiff relies on an unsupported representation from counsel in a footnote in one of plaintiffs' briefs that "Fitzner alleges that he never received a signed copy." (Doc. 66, at 3 n.2.)  This is improper.  On summary judgment, the Court does not consider "facts" propounded in the parties' submissions without proper citations to the record.  *See* Local Rule 7.2(a) (requiring summary judgment briefs to have "all findings of fact appropriately referenced to the supporting document or documents filed in the action or in support of the motion"); *Taylor*, 561 F. Supp.2d at 1275 n.11 ("Unadorned representations of counsel in a summary judgment brief are not a substitute for appropriate record evidence.").

-51-

acceptance never reaches its destination.").

Perhaps in recognition of these glaring infirmities and profound weaknesses in Count Four, Fitzner offers no meaningful response to Holiday Isle's Motion for Summary Judgment concerning same.  This Court will not endeavor to marshal facts and legal arguments in support of Fitzner's position, where he has made no effort to do so himself.  Under the circumstances, the Court finds that Holiday Isle's Motion for Summary Judgment is due to be **granted** as to Count Four of the Complaint.

**VI.    Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.      Defendant's Motion for Leave to Submit Supplemental Evidence (doc. 57) is **granted**.

2.      Defendant's Motion for Summary Judgment (doc. 58) is **granted in part**, and **denied in part**.  Plaintiffs' Motion for Partial Summary Judgment (doc. 67) is likewise **granted in part**, and **denied in part**.

3.      On a claim-by-claim basis, the Court's rulings are as follows:

   a.      With respect to Count One, plaintiffs' Motion is **granted** and defendant's Motion is **denied** as to plaintiffs' claim that Holiday Isle violated § 1703(c) by failing to provide notice of their rescission rights and that Holiday Isle is liable to plaintiffs for any damages they incurred that were proximately caused by such violation.  Defendant's Motion is **granted** insofar as Count One seeks damages for defendant's failure to register the Project with HUD, failure to provide plaintiffs with the printed property report, and inclusion of contract language specifically designed to avoid application of the ILSFDA.  Those aspects of Count One are **dismissed**.

   b.      With respect to Count Two, both plaintiffs' Motion and defendant's Motion are **denied** insofar as they relate to application of Paragraph 6(B). However, summary judgment is **granted** to defendant on that portion of Count Two seeking a declaration that Holiday Isle's certification to plaintiffs' lenders in August 2007 that plaintiffs were in default and its

ensuing efforts to draw on the letters of credit violated Paragraph 11(a) of the Agreements.  That portion of Count Two is **dismissed**.

c. With respect to Count Three, defendant's Motion is **granted** insofar as plaintiffs seek to hold defendant liable for not maintaining the proceeds of the letters of credit in an escrow account.  That aspect of Count Three is **dismissed**.  In all other respects, both sides' summary judgment motions are **denied** as to Count Three because they turn on application of Paragraph 6(B), as to which genuine issues of material fact remain.

d. Defendant's Motion is **granted** as to Count Four, and Count Four is **dismissed**.

4. Although this multipart ruling may appear complex, its implications for trial are straightforward.  The only triable issues remaining are as follows: (i) as to Count One, whether Holiday Isle's violation of its ILSFDA disclosure obligations under § 1703(c) proximately caused plaintiffs not to exercise their statutory right of rescission in a timely manner and, if so, the amount of damages they sustained; (ii) as to Count Two, whether plaintiffs' Units (meaning their individual, numbered, private dwelling units, without regard to any common elements or limited common elements) were completed (not merely "substantially completed") as of April 1, 2007 (or July 14, 2007, in the case of plaintiff Fitzner) for purposes of Paragraph 6(B); and (iii) as to Count Three, the amount of damages incurred by plaintiffs when defendant drew on their letters of credit, but only if Count Two is resolved in plaintiffs' favor.  The parties are strongly encouraged to work diligently to hone their trial presentations to focus on these specific and discrete issues, which are the only remaining portions of this case, and to excise extraneous, redundant or already-decided matters from their evidence and argument at trial.

DONE and ORDERED this 24th day of March, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

-53-